**SERVICE & TRAINING, INC. and Robert J. Montgomery**

v.

**DATA GENERAL CORPORATION and Data General Service, Inc.**

**Civ. No. JFM–89–2119.**

United States District Court,
D. Maryland.

May 14, 1990.

Dov Apfel, Hoffman, Apfel & Lyons, P.C., Rockville, Md., for plaintiffs.

Kevin Light, Choate, Hall & Stewart, Boston, Mass., and Bob Mathias, Piper & Marbury, Baltimore, Md., for defendants.

## OPINION

MOTZ, District Judge.

This case involves the question of whether plaintiff, Service & Training, Inc. ("STI"), may use a diagnostic software program called "MV/Advanced Diagnostic Executive System" ("MV/ADEX"), which has been developed, manufactured and copyrighted by defendant, Data General Corporation. STI claims—and Data General disputes—that the plaintiffs have a right to use the diagnostic on one of three grounds: 1) a 1976 agreement between Data General and Robert Montgomery, one of STI's principals, allegedly authorizing such use; 2) invalid MV/ADEX copyrights; 3) Data General's alleged violations of the anti-trust laws in restricting access to MV/ADEX.

STI has moved for a preliminary injunction barring Data General from asserting and communicating to third parties that STI does not have the right to use MV/ADEX. Data General has moved for a preliminary injunction barring STI from using MV/ADEX and requiring it to turn over to Data General any copies of the program in its possession. Data General's motion for a preliminary injunction will be granted and STI's denied.

Both parties have also moved for partial summary judgment as to certain aspects of the case. In effect, they both take the position that they are entitled to a permanent injunction.[1] Extensive discovery has

---

1. STI, while recognizing that factual issues are presented as to its claims of copyright invalidity and anti-trust violations, contends that it is entitled to relief as a matter of law on the basis of the 1976 agreement (discussed *infra*). Data General contends that, in regard to its MV/ADEX claim, there are no material facts genuinely in dispute concerning the 1976 agree-

been conducted, and an evidentiary hearing lasting seven days has been held. STI's motion for summary judgment will be denied. Summary judgment will be entered for Data General on STI's claims under the 1976 agreement and section 1 of the Sherman Act. Summary judgment will be denied, however, on STI's claim that Data General's restrictions on the distribution of MV/ADEX constituted monopolization or attempted monopolization in violation of section 2 of the Sherman Act.

## BACKGROUND [2]

Data General is in the business of designing, manufacturing and selling large-scale computer systems. It competes with such companies as IBM, Digital Equipment Corporation, Wang Laboratories and Hewlett Packard.[3] STI is in the business of maintaining and repairing Data General equipment and peripheral equipment manufactured by other companies and used by some Data General customers with their computers. Approximately fifty per cent of STI's workforce is composed of former employees of Data General. The two principals of STI are Robert Guilliams and Robert Montgomery. Montgomery (who is also a plaintiff in this action) is himself a former employee of Data General.

### The 1976 Settlement Agreement

Of central importance to this case is a settlement agreement entered into in 1976 between Data General, on the one hand, and Montgomery, Lloyd Root and Computer Systems Support Corporation ("CSSC"), on the other. Root and Montgomery had left Data General's employ in 1973 and 1975, respectively, and Data General, believing that they had taken confidential information with them, brought suit against them and their newly formed corporation, CSSC.[4] After discovery had been completed, Data General concluded that it would have difficulty proving its allegations. Accordingly, Data General agreed to a settlement under which no money was paid. One of the terms of the settlement was that CSSC, Root and Montgomery were not

---

ment, the alleged copyright invalidity or the alleged anti-trust violations.

Data General also seeks a permanent injunction restricting STI from using another diagnostic program, Nova/Eclipse ADEX, except in maintaining, repairing or integrating a computer system with which a copy of the program has been supplied. There appears to be a genuine factual dispute concerning the extent to which Data General has effectively restricted the distribution and use of Nova/Eclipse ADEX. Although it contests the materiality of this dispute, Data General has not sought a preliminary injunction or summary judgment in connection with its Nova/Eclipse ADEX claim.

2. For the most part the facts as here stated are uncontradicted. To the extent, however, that there are inconsistencies between the testimony of STI President Robert Guilliams and STI Vice President Robert Montgomery, on the one hand, and the testimony of Data General's witnesses and its documentary evidence, on the other, I credit the latter for a variety of reasons. These include the following: (1) Guilliams and Montgomery were somewhat imprecise and evasive in critical portions of their testimony, *e.g.*, specifying the source of the copies of MV/ADEX in STI's possession. (2) Contemporaneous business records kept by Data General prove beyond doubt that Guilliams did not testify truthfully on one point (whether he had used a renewal subscription sent to STI for a computer owned by the University of Connecticut in obtaining a copy of Nova/Eclipse ADEX from Data General). (3) Guilliams was responsible for a misleading brochure prepared to solicit investors in STI, which stated that STI had the right to use Data General's most recent proprietary information without disclosing that Data General vigorously disputed that right. (4) Montgomery was responsible for a similar non-disclosure to Richard Sullivan, a former Data General employee who was hired by Montgomery and who was concerned about the viability of STI, particularly its right of access to Data General's proprietary information. (5) Guilliams attempted to obtain spare parts, not publicly available, directly from one of Data General's equipment manufacturers on the basis of the 1976 agreement (discussed *infra*) after Data General had itself refused to provide the parts to STI. This effort, unethical in and of itself, was particularly egregious in light of Montgomery's testimony in this case that he did not believe that the 1976 agreement, to which he had been a party, covered spare parts.

3. Data General Service, Inc., also a defendant in this case, is Data General Corporation's servicing subsidiary. For simplicity's sake, I will refer to both defendants collectively as "Data General."

4. *Data General Corporation v. Computer Systems Support Corporation, Lloyd E. Root, Jr., and Robert Montgomery,* Civil Action No. M–75–1796 (D.Md.1975).

to use Data General's proprietary information for

the design or manufacture of computers or any other purpose except [i] maintenance or repair of DGC equipment, [ii] installation and integration of equipment manufactured or sold by companies other than DGC, or [iii] other purposes permitted by any proprietary or confidentiality legends accompanying or made part of any data or documentation comprising Propriety Information.

Montgomery left CSSC in 1980. After working on his own for a short period of time, he joined STI, a company which had been formed by Guilliams. Root continued to own and operate CSSC until he sold it to Grumman Systems Support Corporation ("Grumman") in 1984. In 1988 Montgomery assigned to STI his rights under the 1976 agreement.

*Data General's Development of Diagnostic Software*

Diagnostic software, as its name implies, is used to diagnose problems in central processing units and other computer equipment. Diagnostics are used in the design and manufacture of computers as well as in their field service maintenance and repair. Over the years Data General has developed various diagnostics for use on its older-model 16–bit computers. These diagnostics have been copyrighted under the names "DTOS" and "Nova/Eclipse ADEX." They have generally been made available to Data General customers under an agreement which restricts their use to the particular computer with which they were provided.

In 1981 Data General began to manufacture a line of 32–bit computers known as "MV" computers. Thirty-two-bit computers are substantially more powerful and sophisticated than 16–bit computers. For example, a 32–bit computer can (1) execute over 80 times as many instructions per second as a 16–bit computer, (2) accomplish within one-half hour what it would take a 16–bit computer 40 hours to do, (3) accommodate 1,024 simultaneous users as compared to the 64 simultaneous users accommodated by a 16–bit computer and (4) handle eight times as many pieces of peripheral equipment as a 16–bit computer. A 32–bit computer has 4.3 billion units of memory or "addressable locations" as opposed to the 32,000 addressable locations in a 16–bit computer.

"MV/DTOS" was the first diagnostic software program used with Data General's 32–bit computers. In mid–1984, after two years of development, Data General introduced a new diagnostic called "MV/ADEX" (first named "MV/ADES"). The cost of developing and subsequently revising this program has been approximately $10.8 million. Although some of the files on MV/ADEX have the same names and perform the same functions as did files on earlier versions of Data General's diagnostics, all of the MV/ADEX files have been reworked for use on MV computers. Moreover, hundreds of files have been newly created for MV/ADEX. MV/ADEX contains within itself information which could provide Data General's competitors with valuable insights concerning the design and manufacture of MV computers.

From the time that MV/ADEX was first introduced, Data General has placed severe restrictions on its dissemination outside of Data General. In contrast to the diagnostics for 16–bit computers, MV/ADEX has not been generally distributed to customers. Rather, it has been provided to only two categories of customers: those who have so-called "Remote Assistance" ("RAC") agreements with Data General and those who are "Co-operative Maintenance Organizations" ("CMOs").[5] RAC

5. STI contends that Data General did not effectively restrict the dissemination of MV/ADEX, but the record does not support that contention. In that regard the following considerations are relevant: (1) Although employees of STI testified that they saw MV/ADEX at various customer sites, STI presented no proof that the customers in question were not under restrictive agreements with Data General and/or that the MV/ADEX had been placed there by Data General (rather than by other STI employees who had earlier been servicing the customers). (2) STI did not identify a single specific source where it obtained MV/ADEX. (3) Documenta-

agreements, signed in tandem with Data General service agreements, provide for the installation of MV/ADEX on the customer's computer. Data General field engineers can remotely activate the customer's MV/ADEX program, via modems at Data General's service headquarters in Atlanta, Georgia, to service the customer's computer and to pinpoint equipment failures in the event of a breakdown. RAC customers sign an agreement stipulating that MV/ADEX remains the property of Data General while it is at the customer's site. When a RAC agreement is cancelled, Data General field technicians are instructed to pick up the MV/ADEX tape in the customer's possession and to break the link which provides access to the MV/ADEX program resident in the computer itself.

CMOs are a limited number of large and sophisticated customers who service their computers themselves. Data General developed its CMO program to remain competitive with other computer manufacturers who provide a similar service. CMOs sign strictly worded license agreements restricting their use of the MV/ADEX tapes and disks they receive to the MV computers with which the tapes are supplied. Some CMOs provide computer systems and services to customers of their own, and these third-party customers must either enter into the same license agreements with Data General or enter into sublicenses with the CMO containing the same restrictive provisions.

## STI's Use of MV/ADEX

STI asserts that it has continuously been using MV/ADEX since 1984 when Data General first introduced it. Attempting to show that MV/ADEX is as generally available as Data General's 16–bit diagnostics, STI witnesses testified that copies of MV/ADEX have always been available for their use in STI's library and that copies have been made for each of STI's field technicians. None of these witnesses, however, specified a single customer site or other location where STI found MV/ADEX and copied it. Furthermore, the record is uncontradicted that STI attempted to purchase a copy of MV/ADEX from Data General on several occasions, and Data General refused to sell it.

The record is also clear that, until the institution of this action, STI's use of MV/ADEX was secretive. It attempted to purchase a copy of MV/ADEX from Data General, apparently in order to disguise the fact that it had already obtained a copy by unauthorized means. In bidding for contracts which required the contractor to have access to the computer manufacturer's most recent diagnostics, STI never disclosed that it was using MV/ADEX—even though such a disclosure would have been in its interest. And only three months before filing this action, STI's counsel, in response to an inquiry from Data General, rather circumspectly wrote that STI would provide a copy of MV/ADEX to Data General if STI was, in fact, in possession of one.[6]

ry evidence unquestionably demonstrated that one customer, On–Line Computer Library Center ("OCLC"), to whom STI alleges that Data General was promiscuously distributing MV/ADEX, was actually being shipped Nova/Eclipse ADEX by Data General and that, in any event, OCLC was under a strict licensing agreement with Data General. (4) STI's own efforts, both overt and surreptitious, to obtain MV/ADEX from Data General were unsuccessful. (5) The uncontradicted testimony of Data General's witnesses established that the importance of keeping MV/ADEX secret was recognized from the outset and that the distributions of the diagnostic to RAC customers and CMOs were authorized only as narrow exceptions to the general prohibition against dissemination outside of Data General. (6) There was an absence of any proof that any other third-party

maintenance organization (other than certain CMOs and Grumman, against whom Data General has obtained an injunction) has used MV/ADEX. (7) As STI itself emphasizes (in connection with its anti-trust claims), the government found as to one service contract that Data General was a sole source since it alone had access to MV/ADEX.

6. I do not suggest that there was anything improper about counsel's letter. He had only recently undertaken the representation of STI and had good reason to be careful in what he said. However, if, as STI alleges, it was fully entitled to use MV/ADEX, there was no reason for Guilliams and Montgomery not to instruct counsel to state freely that STI was regularly using the diagnostic.

*The Initiation of this Action*

In March 1988, Data General, having learned that Grumman Systems Support Corporation (the successor to CSSC) was using MV/ADEX, filed suit against Grumman in the District of Massachusetts. On December 29, 1988, United States District Judge Walter Skinner entered a preliminary injunction prohibiting Grumman's continued use of MV/ADEX. *Data General Corporation and Data General Service, Inc. v. Grumman Systems Support Corporation*, No. 88-0033-S, 1988 WL 159936 (D.Mass. Dec. 29, 1988) (WESTLAW, DCT database).

In March 1989, Data General issued deposition subpoenas to Montgomery and Guilliams in connection with the Grumman case. As a result of negotiations between counsel, these depositions were held in abeyance in exchange for the production of documents and other materials by STI. A copy of MV/ADEX was among the materials STI produced. When counsel for Data General realized this fact, they wrote to counsel for STI saying that if STI did not assure Data General by July 24, 1989, that it would cease using MV/ADEX, Data General would file suit against it. STI did not give such an assurance. Instead, it filed this action on July 24th, 1989.

## DISCUSSION

Three issues require resolution: (1) whether the 1976 agreement entitles STI to use MV/ADEX; (2) whether Data General's copyright on MV/ADEX is valid; and (3) whether Data General has violated the federal anti-trust laws in restricting the access of third parties to MV/ADEX.[7]

**7.** In light of my other rulings, I need not address the question of the relative harms to the parties arising from the issuance or non-issuance of a preliminary injunction. However, I note that Data General has suffered presumptive harm as a consequence of STI's violation of its copyright. *See, e.g., Concrete Machinery Co. v. Classic Lawn Ornaments*, 843 F.2d 600, 611 (1st Cir.1988) and cases cited; *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189, 192 (2d Cir.1985) and cases cited. I also note that the evidence establishes that two other diagnostic programs for MV computers are available to

*The 1976 Agreement*

STI's position concerning the 1976 agreement has changed somewhat during the course of this litigation. In their depositions Guilliams and Montgomery asserted that the 1976 agreement gave them the right to use MV/ADEX free of charge or for a nominal reproduction fee. Apparently recognizing the inherent unreasonableness of this contention, STI now argues that the meaning of the agreement was more complex, requiring Data General to provide MV/ADEX for a "reasonable license fee" to its customers who want to use STI's maintenance services on their computer systems.

As Judge Skinner found, in rejecting the same contention made by Grumman in the Massachusetts litigation, if STI's contention concerning the meaning of the agreement were correct, the agreement would be unenforceable as a mere agreement to agree. *See, e.g., First Nat'l Bank of Maryland v. Burton, Parsons & Co.*, 57 Md. App. 437, 448, 470 A.2d 822, 828 (1984), *cert. denied*, 300 Md. 88, 475 A.2d 1200 (1984), as cited in *Data General v. Grumman* (WESTLAW, DCT database). The agreement contains no provision setting the amount of a license fee or establishing the procedure and standards by which such a fee would be determined. Indeed, the agreement does not even mention a license at all.

In any event, STI construes the 1976 agreement far beyond its intended meaning. The agreement's context was established by the suit which Data General had filed against Montgomery and Lloyd Root. Montgomery and Root had been relatively low-level employees who had left Data General and later started a third-party mainte-

STI. One of those diagnostics has been developed by Grumman and is being used by Grumman to compete effectively with Data General. Guilliams testified that he understood the Grumman diagnostic to be fully functional for field service work. Although he further testified that when he was first shown the Grumman diagnostic, it was lacking documentation, he admitted that he has not since inquired of Grumman if the necessary documentation has been prepared. On this record the balance of hardships would seem to weigh in favor of Data General.

nance service company of their own. Data General believed that they had taken with them certain proprietary information made available by Data General only to its own employees. The agreement was entered into only after discovery proceedings had satisfied Data General that Root and Montgomery had not taken such information or, at least, that Data General could not prove that they had done so.

The purpose of the agreement was, in effect, to codify the rights of the parties as they existed at the time of the settlement. Root, Montgomery and their company, CSSC, were generally prohibited from using Data General's proprietary information. An exception to this general prohibition was made in order to permit Root, Montgomery and CSSC to use propriety information in the hands of Data General's customers in a manner consistent with any restrictive legends or agreements on the use of that information. Specifically, Root, Montgomery and CSSC were authorized to use software and documentation provided by Data General to its customers for maintaining, repairing and integrating the computer systems of those customers.

STI seeks to imply from this exception an affirmative obligation upon Data General to put into customers' hands the software and documentation necessary to enable STI to do repair, maintenance and integration work. However, no such affirmative duty was established by the language of the agreement itself. The only obligations placed upon Data General were to dismiss the lawsuit and to provide a general release for any accrued claims that it had. Nowhere did Data General undertake to provide Root, Montgomery and CSSC with any software, documentation or other proprietary information in the future or to make such materials available to them by entering into license agreements with its customers. Merely to infer such an obligation would be self-evidently unreasonable. Clearly, if Data General had been asked in the course of the negotiations of a settlement of a relatively minor lawsuit to bind itself to provide, directly or indirectly, all of the proprietary information which it might develop in the future to two of its former employees (whom it suspected of misappropriating trade secrets), it would have rejected the request out-of-hand.

The testimony of the lawyers who negotiated the 1976 agreement confirms that the agreement does not have the meaning ascribed to it by STI. Jerome Kowalski, one of the attorneys who represented Data General, recalls that Edward Canfield, who then represented Root, Montgomery and CSSC, specifically requested that his clients be permitted to purchase from Data General materials which Data General provided to its own field personnel and that this request was denied. Rather, according to Kowalski, Root, Montgomery and CSSC were to be permitted to use only those proprietary materials which Data General routinely placed in the hands of its customers and only in accordance with any restrictions placed upon those materials. Although Canfield does not recall having requested permission for STI to purchase internal proprietary information from Data General, his recollection is essentially consistent with Kowalski's. Canfield understood that his clients could use whatever proprietary information was in the possession of Data General's customers for performing maintenance, repair and integration work, but that such use had to be consistent with any restrictions placed on the materials.[8]

---

**8.** I note that Mr. Canfield and Mr. Kowalski both impressed me as being extremely honest and forthright in their testimony. I attribute those instances where their recollections do not entirely coincide to the different perspectives which they had of the negotiations leading to the 1976 agreement and to the frailties of human memory.

It is also clear to me that Canfield and Kowalski believed, in negotiating the 1976 agreement, that they were honorably resolving the dispute then existing between the parties and that they both contemplated that their clients would act in good faith under the agreement. For example, I have no doubt that it would have been a breach of Kowalski's own expectations (as well as a violation of a duty imposed upon Data General by common law) if, immediately after the agreement was made, Data General had stopped providing its customers with diagnostics for the purpose of preventing Root, Montgomery and CSSC from performing third-party

It should finally be noted that several pieces of circumstantial evidence demonstrate unequivocally that the 1976 agreement was not intended to confer upon Root, Montgomery, CSSC and their successors a right of access to proprietary information which Data General decided to keep internal to itself.

(1) In October 1977, counsel for Data General wrote to Canfield stating that Data General had learned that CSSC might be using schematics which Data General did not supply to its customers. Canfield does not specifically recall what he did with the letter, but he agrees that he would have taken it up with his clients because he did not understand that they had the right to use information which Data General restricted to its own personnel.

(2) On one occasion STI obtained a copy of Nova/Eclipse ADEX from Data General by sending in a software renewal subscription notice sent to it on behalf of the University of Connecticut—a customer whose computers STI had previously serviced and upon whose behalf STI had previously received diagnostic software. *See supra*, note 2. If STI believed that it had a right to obtain diagnostics from Data General under the 1976 agreement for its general use or, as was the case in this instance, for use in bidding on a government contract, STI surely would have sought to exercise that right rather than attempting to obtain Nova/Eclipse ADEX by devious means.

(3) If STI believed that Data General was obligated under the agreement to provide STI (or customers desiring to retain its maintenance and repair services) with MV/ADEX, it would not have kept its use of MV/ADEX secret. To the contrary, it would have advised potential customers of its contract right, especially those customers who made access to the manufacturer's most up-to-date diagnostics a requirement for bidding.

(4) The evidence establishes that Canfield communicated primarily with Lloyd Root when negotiating the 1976 agreement and that Montgomery's contacts with Canfield were only through Root. Root's understanding of the agreement can be inferred from the fact that, until Data General instituted suit against Grumman (Root's successor in interest), Grumman took the position (in papers which came to light in the litigation) that it did not have the right to use MV/ADEX.[9]

### The Validity of Data General's Copyright

■ STI next contends that Data General's copyright for MV/ADEX is invalid be-

---

maintenance, repair and integration work. That, however, is not what actually occurred. Rather, the record establishes that there was ample business justification for Data General's decision to restrict the distribution of MV/ADEX (which was not in existence in 1976) and that in making that decision Data General was not motivated in any way by a desire to undermine the 1976 agreement.

Furthermore, to the extent that the 1976 agreement carried with it an implied duty of good faith, the duty fell upon Root, Montgomery, CSSC and their successors as equally as it did upon Data General. The record establishes that STI did not meet that duty. It attempted to obtain proprietary materials (including spare parts to which it did not have even an arguable right) surreptitiously from Data General. It admits that it used Data General's proprietary materials for purposes (including repairing component parts at its depot in Colorado Springs) other than maintaining, repairing or integrating the computer systems with which the materials were supplied. In that connection Guilliams testified that he never read the restrictive legends on Data General's materials, just as he never reads the foreword of a book. STI also sent its employees to training courses at Data General to obtain information for use in servicing the computer systems of STI's customers in violation of a certification on Data General's application form restricting the use of such information to work to be performed on STI's own Data General computers. Certainly, Mr. Canfield, who testified that he understood the 1976 agreement to authorize his clients only to obtain proprietary information from Data General in a proper manner, would not have countenanced such conduct.

9. STI takes the position that any reliance upon the testimony of the lawyers who drafted the 1976 agreement and upon other extrinsic evidence concerning its meaning *ipso facto* demonstrates that there is a dispute of material fact precluding the entry of summary judgment. This position is fallacious. The agreement is clear on its face in that it places no affirmative obligation on Data General to do anything for STI. The other evidence merely establishes the context in which the agreement was made and further clarifies what otherwise might be opaque.

cause MV/ADEX does not constitute original material. Alternatively, STI argues that the copyright is invalid because MV/ADEX is a derivative of earlier diagnostics manufactured by Data General and Data General did not disclose this fact to the Copyright Office.

Data General's copyright for MV/ADEX is registered. The certificate of registration is "prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c) (1988). The burden is upon STI to rebut this statutory presumption. *See, e.g., Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189, 192 (2d Cir.1985). STI has not met that burden. All that it has shown is that the names and functions of some of the files on MV/ADEX are the same as ones on prior diagnostics. It has not offered evidence that the object code—the method of communicating with the computer which is protected by the copyright laws—is the same. Rather, the evidence presented by Data General stands uncontradicted that existing files were substantially re-worked in the development of MV/ADEX. Moreover, it is undisputed that there are approximately 1200 files on MV/ADEX as compared with 200 files on its immediate predecessor, Nova/Eclipse ADEX. This alone is sufficient to establish that MV/ADEX is an original, not a derivative, work.[10]

*The Anti–Trust Claims*

STI's final contention is that Data General has violated sections 1 and 2 of the Sherman Act[11] by imposing restrictions upon the distribution and use of MV/ADEX. As a preliminary matter, it should be noted that numerous courts have held that an alleged violation of the anti-trust laws, while perhaps affording a ground for affirmative relief, generally does not provide a defense to copyright infringement. *See, e.g., Interstate Hotel Co. v. Remick Music Corp.*, 157 F.2d 744, 749 (8th Cir.1946), *cert. denied*, 329 U.S. 809, 67 S.Ct. 622, 91 L.Ed. 691 (1947), *reh'g*

*denied*, 330 U.S. 854, 67 S.Ct. 769, 91 L.Ed. 1296 (1947); *Orth–O–Vision v. Home Box Office*, 474 F.Supp. 672, 686 (S.D.N.Y.1979); *see also United Tel. Co. of Mo. v. Johnson Publishing Co., Inc.*, 855 F.2d 604, 611–12 (8th Cir.1988) (citing *Edward B. Marks Music Corp. v. Colo. Magnetics Inc.*, 497 F.2d 285, 290 (10th Cir.1974), *cert. denied*, 419 U.S. 1120, 95 S.Ct. 801, 42 L.Ed.2d 819 (1975)) (positing the possible legal viability of the defense but finding it not to have been factually established). *But cf. Tempo Music, Inc. v. Myers*, 407 F.2d 503, 507 (4th Cir.1969). In any event, on the merits, STI's anti-trust claims would not warrant the denial of relief, at least preliminary injunctive relief, to Data General on its infringement claims.

■ STI alleges that Data General has violated section 1 by wrongfully tying customer access to MV/ADEX (the "tying" product) to unwanted Data General computer maintenance and repair services (the "tied" product). In order to prove a section 1 *per se* tying claim, a plaintiff must establish: (1) the existence of two separate and distinct products or services and an agreement conditioning the sale of the tying product to the purchase of the tied product; (2) that the seller possesses sufficient economic power with respect to the tying product to restrain free competition appreciably in the market for the tied product; and (3) that the seller has thereby foreclosed a substantial amount of commerce. *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, 12–16, 18–21, 104 S.Ct. 1551, 1558–1560, 1561–1563, 80 L.Ed.2d 2 (1984) (citations omitted).

STI has not and cannot meet its first burden of proving the existence of two separate and distinct products or services. *Id.* at 18–21, 104 S.Ct. at 1561–1563. MV/ADEX is, of course, as a tangible object, a thing separate and distinct from the service of maintaining and repairing computers. However, the question of whether

---

**10.** As to STI's claim that Data General did not advise the Copyright Office of the "derivative" nature of MV/Adex, STI has also failed to meet its burden of proving that the omission was intentional. *See, e.g., Donald Frederick Evans v.*

*Continental Homes, Inc.*, 785 F.2d 897, 904 (11th Cir.1986).

**11.** 15 U.S.C. §§ 1, 2 (1988).

MV/ADEX is separate and distinct from maintenance and repair service must be approached by inquiring into the nature of the consumer demand for it. *Id.* at 19, 104 S.Ct. at 1562. There is only one legitimate purpose for which Data General's customers would use MV/ADEX: to maintain and repair computer systems.[12] Thus, it is self-evident that MV/ADEX and maintenance and repair service are inextricably bound together and cannot be considered to be separate and distinct from one another.[13] MV/ADEX is merely one feature of Data General's integrated and unified "product" —computer servicing. This being so, Data General is entitled to summary judgment on STI's tying claim.

 STI's section 2 claim is that Data General has monopolized or attempted to monopolize the service market for Data General computers by the restrictions it has placed upon the use of MV/ADEX. Monopolization requires (1) possession of monopoly power in the relevant market and (2) willful acquisition or maintenance of that power. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–572, 86 S.Ct. 1698, 1703–1704, 16 L.Ed.2d 778 (1966). STI asserts that the relevant market is the Data General service market. Data General asserts that STI has misframed the question and the relevant market is the service market for all computers. Alternatively, Data General argues that, assuming its computers alone comprise the relevant service market, it lacks the necessary power to control that market. In the latter regard, Data General points to the fact that purchasers of large, sophisticated computer systems look to a continuum of factors— from the cost and quality of hardware to the cost and quality of maintenance and repair service—in deciding which system to buy. Thus, Data General reasons, if it were to raise the cost of service to non-competitive levels or to reduce the quality of its services, its customers and potential customers would be driven into the arms of its many manufacturing competitors.

I am inclined to be of the view that STI has properly defined the relevant market. After all, the owner of a Data General computer must turn to a serviceman who can repair his computer, not an IBM or DEC system. *See United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956) (test is whether commodities are "reasonably interchangeable by consumers for the same purposes"). However, there is force in Data General's argument that its power to control the service market for its equipment must be analyzed and considered in the broader context of the sale and servicing of systems manufactured by its competitors. Furthermore, STI may well not be able to prove that Data General "willfully" acquired the power which it does possess in the service market, as "distinguished from growth or development as a consequence of superior product, business acumen, or historical conduct." *Grinnell*, 384 U.S. at 571, 86 S.Ct. at 1704. The most that STI has thus far shown is that MV/ADEX is a better diagnostic tool than any others available, and STI itself concedes that, absent some other factor, no

12. As noted earlier, MV/ADEX is also used in designing and manufacturing MV computers, but STI does not contend that this is a purpose for which anyone other than Data General may properly use it.

13. Of course, an alleged tying product and an alleged tied product frequently may be "inextricably bound together" in the sense that the tied product has a purpose directly related to the alleged tying product. Thus, for example, copying paper is intended to be used with a copying machine, and a manufacturer of copying machines with a dominant position in the manufacturing market could not lawfully tie the purchase of copying paper to the purchase of its equipment. The present case is fundamentally different in concept, however. MV/ADEX is the alleged *tying* product, and the relevance of the inquiry into its purpose is to determine whether there exists a market for it separately and independently from the servicing of Data General computers. There being no such market, MV/ADEX cannot be properly viewed as a product distinct from the service which it provides. It is simply a tool which does the job of servicing in a better fashion, and there is no greater basis in the anti-trust law for requiring Data General to share that tool with its service competitors than there would be for requiring a carpenter who had developed a better hammer to distribute it to his competitors in the construction trade.

one need share his superior product with his competitors. *See, e.g., Olympia Equipment Leasing v. Western Union Tel.*, 797 F.2d 370, 375–76 (7th Cir.1986), *reh'g. denied*, 802 F.2d 217 (7th Cir.1986), *cert. denied*, 480 U.S. 934, 107 S.Ct. 1574, 94 L.Ed.2d 765 (1987).[14]

STI has requested the opportunity to conduct further discovery on its section 2 claims, and it is entitled to that opportunity.[15] However, in the final analysis, it appears that STI's claims may be based more upon concern over a fundamental structural change occurring in the computer service and repair market rather than upon any conduct engaged in by Data General in violation of the anti-trust laws. Large computer manufacturers, after years of tolerating—if not encouraging—third parties (typically relatively small companies) to provide maintenance and repair services which they were not providing themselves, have begun to provide such services and to market them aggressively. Not only do they now maintain and repair their own computers but also the equipment of their competitors in those instances where their customers own more than one type of system. STI's concern about this change in market structure—in the context of which the restrictions on the distribution and use of MV/ADEX have been imposed by Data General—is understandable. However, companies, be they large or small, have no vested interest in an existing market structure, and, as has often been said, the anti-trust laws are designed to protect competition, not competitors. *See, e.g., Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 115, 107 S.Ct. 484, 492, 93 L.Ed.2d 427 (1986) (citing *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d

510 (1962)). It is against the background of these principles that STI's section 2 claim will have to be ultimately resolved.

A separate order is being entered herewith effecting the rulings made in this opinion.

## ORDER

For the reasons stated in the opinion entered herein, it is this 14th day of May, 1990

ORDERED

1. The opinions and orders entered by this Court on March 7, 1990, and May 4, 1990 are hereby withdrawn;

2. Plaintiffs' motion for a preliminary injunction is denied;

3. Defendants' motion for a preliminary injunction is granted;

4. Plaintiffs, their officers, directors, employees, servants, agents, attorneys and all persons in active consort or participation with them, are preliminarily enjoined from copying and using MV/ADES and MV/ADEX, or any portion thereof, or any diagnostic computer programs derived therefrom, for any purpose.

5. Plaintiffs shall forthwith turn over to defendants all copies of MV/ADES and MV/ADEX, any portion thereof and any diagnostic programs derived therefrom, in plaintiffs' possession, custody or control;

6. Plaintiffs' motion for partial summary judgment on its claim under the 1976 agreement is denied;

7. Summary judgment is entered in favor of defendants against plaintiffs on plaintiffs' claims for breach of the 1976

---

**14.** While STI suggests that it is somehow significant that Data General is also the manufacturer of the computer system which is to be serviced, that consideration is, at least under the circumstances here presented, immaterial. Inchoate in STI's argument is the instinct that it is improper for a manufacturer to make his product in such a way that it can be maintained and repaired only by a tool which he also makes. That may be so, but for anti-trust purposes such an argument would necessarily shift the focus to the manufacturer's power in the product sales market. Here, STI does not, as it obviously could

not, allege that Data General has monopoly power in the computer sales market.

**15.** I originally issued an opinion ruling as a matter of law that Data General lacks monopoly power and that it did not engage in improper conduct in acquiring that power. STI filed a motion for reconsideration on those (and other) issues, and I am now persuaded that my entry of summary judgment for Data General on the section 2 claims was, at least at the present time, erroneous.

agreement and for violation of section 1 of the Sherman Act; and

8. The Clerk is directed to enter as a final judgment the summary judgment rendered in favor of defendants in paragraph 7 hereof since this Court finds, pursuant to Fed.R.Civ.P. 54(b), that there is no just reason for delay in entering that judgment.