**DATA GENERAL CORPORATION**
**and Data General Service, Inc.,**
**Plaintiffs,**

**v.**

**GRUMMAN SYSTEMS SUPPORT**
**CORPORATION, Defendant.**

**Civ. A. No. 88–0033–S.**

United States District Court,
D. Massachusetts.

Sept. 10, 1992.

---

478

Robert S. Frank, Jr., Kevin P. Light, Choate, Hall & Stewart, Boston, MA, Jacob Frank, Morris G. Nicholson, Data General Corp., Westboro, MA, for plaintiffs.

Gary R. Greenberg, Goldstein & Manello, Boston, MA, Charles A. Gilman, Cahill, Gordon & Reindel, New York City, Louis J. Scerra, Jr., Goldstein & Manello, Boston, MA, Gary L. Benton, Andrew M. Gold, Ronald S. Katz, Coudert Bros., San Francisco, CA, David J. Apfel, Paul F. Ware, Goodwin, Proctor & Hoar, Boston, MA, Robert A. Alessi, Cahill Gordon & Reindel, New York City, for defendant.

MEMORANDUM AND ORDER ON DEFENDANT'S MOTIONS ON POST–INJUNCTION DAMAGES AND FOR CONSOLIDATION, PLAINTIFF'S MOTIONS TO STRIKE AND FOR CONTEMPT, AND CROSS–MOTIONS FOR PARTIAL SUMMARY JUDGMENT

SKINNER, District Judge.

Plaintiffs Data General Corporation and Data General Service, Inc., (collectively, "Data General") and defendant Grumman Systems Support Corporation ("Grumman")

are embroiled in litigation over Data General's computer software product called ADEX. I have set out the relevant facts in my memoranda and orders of December 29, 1988, February 29, 1991, May 2, 1991, and June 3, 1992, and I need not repeat them here. Grumman now moves for partial summary judgment on the issue of whether damages may accrue for the period subsequent to the December 29, 1988 preliminary injunction. Data General moves for contempt for Grumman's alleged failure to abide by that injunction. Data General also moves for partial summary judgment on several of Grumman's remaining counterclaims. Grumman in turn moves for partial summary judgment on Data General's copyright claim. Finally, Grumman's counsel moves to consolidate this case for trial with a related case.

Discussion

*I Post–Injunction Damages*

On December 29, 1988 I ordered Grumman to cease using and copying ADEX and to turn over to Data General all copies of the software which were then in Grumman's possession, custody, or control. Grumman now moves for partial summary judgment on the issue of whether Data General would be precluded from recovering damages for Grumman's activities after the December 1988 injunction. The motion is based partly on Grumman's contention that it has fully complied with the injunction. Grumman argues that Data General should not be allowed to contend that its post-injunction market share would have been bigger or its profits greater but for pre-injunction wrongdoing by Grumman. Grumman's argument is that any claim Data General may make for post-infringement damages would be under such theories as loss of good will and market recognition, claims which are not allowed under copyright law and which are necessarily so tenuous and speculative that they must be dismissed as a matter of law.

Data General counters on two fronts: First, it furnishes an affidavit of Larry J. Schwartz, a former Grumman official, in which he asserts that for at least eighteen months after the injunction was issued, Grumman repeatedly copied and used ADEX to service Data General computers, in direct violation of the injunction. Second, it maintains that under applicable law the question of post-infringement damages is a factual inquiry, inappropriate for summary judgment.

■ Data General is correct on both fronts. Grumman's motion is expressly based on its contention that its compliance with the terms of the injunction is uncontested by Data General. With the Schwartz affidavit Data General has introduced evidence from which a jury could assess damages which directly flow from Grumman's post-injunction copyright infringement. The premise for the motion being thus undermined, the motion fails.

■ Even if the Schwartz affidavit were not sufficient, Grumman would still be unable to prevail on its motion. Grumman relies on *Williams v. Arndt*, 626 F.Supp. 571 (D.Mass. 1985), for the proposition that post-injunction damages may be foreclosed as a matter of law. In that case, however, the court found, only after a trial on the merits, that the plaintiff's claims for post-infringement lost profits were too uncertain and speculative *in that case.* The Second Circuit has addressed this issue and stated, "We see no legal barrier to [an award based on loss of good will and market recognition resulting from copyright infringement] so long as the amount of the award is based on a factual basis rather than undue speculation." *Business Trends Analysts, Inc. v. Freedonia Group, Inc.*, 887 F.2d 399, 404 (2d Cir.1989). I hold that even in the absence of the Schwartz affidavit, a trial on the merits is necessary to determine whether an adequate factual basis exists for the jury to assess post-infringement damages in this case.

*II Contempt*

■ Further relying on the Schwartz affidavit, Data General moves the court to find Grumman in contempt of the injunction. Rather than filing an opposition to Data General's motion, Grumman responds by seeking a ninety day briefing schedule on the matter. Grumman says that it needs time to depose Schwartz and other Grumman employees to

determine its position on whether it has complied with the injunction.

"Civil contempt occurs when a party fails to comply with a court order." *General Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379 (9th Cir.1986). "[I]f complainant makes a showing that respondent has disobeyed a decree in complainant's favor, and that damages have resulted to complainant thereby, complainant is entitled as of right to an order in civil contempt imposing a compensatory fine.... The court has no discretion to withhold the appropriate remedial order." *Parker v. United States*, 153 F.2d 66, 70 (1st Cir.1946). Additionally, "[T]here is no scienter requirement for a finding of civil contempt." *AMF, Inc. v. Jewett*, 711 F.2d 1096, 1104 (1st Cir.1983).

Data General has made a showing that it may prevail on its motion, but it has not made a showing that justice would be best served by a pre-trial ruling on this matter. To the contrary, the record of Grumman's activities with respect to infringement, both pre- and post-injunction, will be significantly better developed following a full trial on the merits of the underlying claims. Data General does not argue that it would be harmed or prejudiced if this matter were held in abeyance until after trial. I therefore decline to rule on this issue until after trial, at which time Data General will be free to renew the motion. Grumman remains under an affirmative duty to insure that all of its officers, directors, employees, servants, agents, attorneys, and all persons in active concert or participation with them aggressively comply with the terms of the December 29, 1988 injunction.

### III Data General's Summary Judgment Motions

#### A. Counterclaim Counts I and II

■ Counts I and II of Grumman's Third Amended Counterclaim alleges breach of contract and breach of the implied covenant of good faith and fair dealing resulting from the alleged breach of contract by Data General. These counts arise out of a litigation settlement agreement which Data General and Grumman's predecessor in interest,

Computer Systems Support Corporation ("CSSC") entered into in 1976. Grumman argues that the settlement agreement granted CSSC (and by later assignment, Grumman) either unlimited access to all diagnostic computer software which Data General will ever create, or, in the alternative, a license to purchase, for an undetermined sum, all diagnostic software which Data General may ever create.

The clause in the 1976 agreement upon which Grumman relies reads in its entirety:

Defendants [CSSC, Mr. Root, and Mr. Montgomery, two former Data General employees] agree, jointly and severally, that they will not, directly or indirectly, copy or utilize 'Proprietary Information' of DGC for the design or manufacture of computers or for any other purpose except [i] maintenance or repair of DGC equipment, [ii] installation and integration of equipment manufactured or sold by companies other than DGC, or [iii] other purposes permitted by any proprietary or confidentiality legends accompanying or made part of any data or documentation comprising Proprietary Information. 'Proprietary Information' of DGC shall mean data and documentation which is marked confidential or proprietary to DGC by appropriate legend.

In *Service & Training, Inc. v. Data General Corp.*, 737 F.Supp. 334 (D.Md.1990), another third-party maintenance company, Service & Training, Inc. ("STI"), asserted that pursuant to the same 1976 settlement agreement, it had the right to use ADEX for identical purposes and under the identical theories as those advanced by Grumman in this action. After a seven-day hearing, the court granted Data General's motion for partial summary judgment for Data General on Service Training's claims under the 1976 agreement. The Fourth Circuit affirmed, adopting the district court's reasoning on this issue. *Service & Training, Inc. v. Data General Corp.*, 963 F.2d 680, 689 (4th Cir.1992).

Although no collateral estoppel effect may be given to the decision of Judge Motz in the District of Maryland, nor to the Fourth Circuit's affirming opinion, those cases nevertheless clearly and, in my opinion, accurately,

spell out the law on the precise issue argued by the parties here. I adopt the reasoning of those courts, *see id,* 963 F.2d at 689; 737 F.Supp. at 339–41, and hold that Data General provided CSSC with neither the right to use ADEX nor any license with respect to ADEX by way of the 1976 settlement agreement. Consequently, summary judgment in favor of Data General is appropriate on Count I of Grumman's counterclaim. Because Count II of the counterclaim and Grumman's Fifth, Sixth, Seventh, and Eighth affirmative defenses arise out of and are dependent on Count I, summary judgment is granted to Data General on Count II and the above mentioned affirmative defenses are stricken from the pleadings pursuant to Fed. R.Civ.P. 12(f).

B. Counterclaim Counts V and VI and Data General's Copyright Infringement Claim

Counts V and VI of Grumman's Third Amended Counterclaim seek declaratory judgments that Data General's copyrights in ADEX are invalid and noninfringed. Grumman alleges that (1) the computer programs are wholly functional in nature and incapable of alternate expression; (2) Data General has maintained the authored work in secrecy; (3) Data General intentionally failed to disclose that ADEX is a derivative work as defined by the copyright laws; and (4) ADEX is a machine generated compilation, not an authored work. Data General moves for partial summary judgment on these counterclaims and to strike the parallel assertions which are framed as affirmative defenses to Data General's copyright infringement claim. Grumman moves for partial summary judgment on Data General's copyright infringement claim.

■ The party which bears the burden of proof at trial must advance facts sufficient to satisfy each of the elements of his claim in order to survive a motion for summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The registration of a copyright is prima facie evidence of the validity of the copyright. 17 U.S.C. § 410(c); *M. Kramer Mfg. Co. v. Andrews,* 783 F.2d 421, 434 (4th Cir.1986).

Thus, a successful challenge by Grumman to the validity of Data General's registered copyrights must be accompanied by evidence which could lead to a finding of invalidity.

■ (1) Grumman's claim that the software program is purely functional in nature, like a simple tool which is incapable of alternate expression, is a bald assertion on Grumman's part, unsupported by any evidence. Data General, on the other hand, provides much evidence by way of affidavit showing that there are many ways to write computer programs to achieve the same result, and thus various ways of expressing the same ideas may exist. The very existence of two competing diagnostic software packages, Parse and G–Fix, is evidence that Data General's assertion is correct. In any case, Grumman's lack of any evidence on this issue is fatal to its argument on this ground.

■ (2) The Copyright Act contains no requirement that the copyright holder must make his works public. "[N]othing in the copyright statutes would prevent an author from hoarding all of his works during the term of the copyright." *Stewart v. Abend,* 495 U.S. 207, 229, 110 S.Ct. 1750, 1764, 109 L.Ed.2d 184 (1990). Thus, Grumman's argument that Data General's copyrights to ADEX are invalid because Data General has kept ADEX a secret does not defeat Data General's motion.

■ (3) As with the breach of contract claim, the *STI* decision in the United States District Court for the District of Maryland, as affirmed by the Fourth Circuit, is on all fours with respect to the law applicable to the argument that Data General intentionally failed to disclose that ADEX is actually derived from prior uncopyrighted works. I adopt the reasoning of those courts and hold that in this case, Grumman has failed to show that ADEX was a derivative work under the copyright laws. *See STI,* 737 F.Supp. at 341–42; 963 F.2d at 688–89. Even if ADEX were a derivative work, Grumman has not shown that Data General's failure to advise the Copyright Office of the software's derivative nature was intentional. *See STI,* 737 F.Supp. at 342 n. 10; 963 F.2d at 689.

(4) Grumman alleges that ADEX, as distributed, is a machine-generated compilation of object code, and thus is not an authored work under the copyright laws. However, the Copyright Act affords protection to computer programs which can be used "directly or indirectly in a computer." 17 U.S.C. § 101. Unlike compilations of instructions known as "source code" which may be read and understood by humans and not by computers, an "object code" is a compilation of instructions which has been translated from the source code and is used directly by a computer. Several courts have held that the manifestation of a computer program in its machine-readable "object code" form is protected by the copyright laws. *See Apple Computer Inc. v. Franklin Computer Corp.,* 714 F.2d 1240, 1248 (3d Cir.1983); *Lotus Development Corp. v. Paperback Software Int'l,* 740 F.Supp. 37, 43–44 (D.Mass.1990). Therefore, Grumman's argument that the ADEX tapes at issue are not protected by the copyright laws because they are manifested in object code fails.

Data General has introduced evidence by affidavit that the MV/ADEX object code was produced from the MV/ADEX source code as registered by the Copyright Office. Grumman has introduced no controverting evidence. Summary judgment in favor of Data General on Grumman's counterclaims V and VI is therefore proper, and Grumman's cross-motion for summary judgment on Data General's Count I for copyright infringement is denied. In addition, Grumman's Nineteenth, Twenty–First, Twenty–Second, and Twenty–Third affirmative defenses are stricken pursuant to Fed. R.Civ.P. 12(f), because they merely restate the counterclaims for declaratory judgment as affirmative defenses to Data General's original copyright infringement claim.

### C. Counterclaim Count IX

Data General renews its motion for summary judgment on Grumman's counterclaim IX, alleging unlawful tying. A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will

not purchase that product from any other supplier." *Northern Pacific R. Co. v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 519, 2 L.Ed.2d 545 (1958). Such an arrangement amounts to a *per se* violation of section 1 of the Sherman Act, 15 U.S.C. § 1, if the seller has "appreciable economic power" in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market. *Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 503, 89 S.Ct. 1252, 1258–59, 22 L.Ed.2d 495 (1969). "The essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hospital Dist. No. 2 v. Hyde,* 466 U.S. 2, 12, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984). Grumman alleges that by allowing only two classes of customers a license to use ADEX, i.e., those customers who purchase repair services directly from Data General and those who maintain their own computers (known as Cooperative Maintenance Organizations, or CMO's, these customers typically maintain their own computers but apparently are free to contract with third party maintainers for maintenance and repair), and by denying a license to use ADEX to others who would otherwise use it to compete with Data General, Data General has violated § 1 of the Sherman Act. Under Grumman's theory, the "tying" product is ADEX and the "tied" product is Data General's maintenance and repair service.

On the identical facts of the *STI* case, the Fourth Circuit affirmed summary judgment for Data General on *STI's* tying claim. The question is whether the holding in that case is vitiated by the subsequent opinion of the Supreme Court in *Eastman Kodak Co. v. Image Technical Services, Inc.,* —— U.S. ——, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), in which the Court held that the evidence of a tying arrangement in the sale of parts and services was sufficient to survive a motion for summary judgment.

The court in *STI* correctly listed the elements of a *per se* tying claim:

(1) the existence of two separate products;

(2) an agreement conditioning purchase of the tying product upon purchase of the tied product;

(3) the seller's possession of sufficient economic power in the tying product market to restrain competition in the tied product market; and

(4) a not insubstantial impact on interstate commerce.

In *Eastman Kodak* the Court held that the Kodak parts and services were separate products and that a tying agreement existed. The main thrust of the opinion was that lack of market power in the primary equipment market does not as a matter of law preclude the possibility of market power in the market for parts.

There is nothing in the *STI* ruling that is inconsistent or at variance from any of these holdings. The divergence in the result is based upon different evidence as to the existence of an agreement described in the second element listed above. In *Eastman Kodak* there was positive evidence of such an agreement. —— U.S. at —— and n. 8, 112 S.Ct. at 2080 and n. 8. In *STI*, the court found no evidence which would warrant a finding of the existence of a tying agreement. Grumman's proffer of evidence in this case is no better than the evidence in *STI*. In fact, it is exactly the same. Accordingly, the counterclaim is insufficient and summary judgment should enter.

### D. Counterclaim XI

Grumman alleges that by implementing the CMO (Cooperative Maintenance Organization) program, Data General has unlawfully allocated the market in violation of section 1 of the Sherman Act. During discovery, Grumman had pursued a theory that by explicit agreement, Data General had conspired with the Eaton Corporation to reduce competition in the MV computer maintenance and repair market. Apparently Grumman has now dropped this theory. Grumman offers no evidence supporting this count other than its argument that the basic structure of the CMO program carries with it an implicit agreement of noncompetition between Data General and the individual CMO's. As noted above, however, Data General proffers evidence showing that the CMO agreements do not carry with them any noncompetition agreement. Further, Data General points to the existence of at least one CMO, General Electric, which is also a third-party maintainer of Data General computers and is an active competitor of Data General in this market.

Section 1 of the Sherman Act requires a "contract, combination, or conspiracy" for liability to lie. 15 U.S.C. § 1. Although the conspiracy may be proved by evidence of a tacit agreement, *see American Tobacco Co. v. United States*, 328 U.S. 781, 809, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946), in the absence of an explicit agreement the co-conspirator must be shown to have "unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement." *Id.* at 810, 66 S.Ct. at 1139.

Data General argues that the implementation of the CMO program was a purely unilateral act on Data General's part and is not prohibited by this provision of the Sherman Act. "A seller's unilateral decision to sell only to certain customers has always been independent action outside the reach of § 1." *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919). *See also Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). Grumman's failure to proffer evidence in support of a theory of conspiracy of non-competition dooms this count under the *Celotex* standard, particularly in light of Data General's affirmative showing that there exist CMO's such as General Electric who actually do compete with Data General in the relevant market.

### E. Counterclaim XIII

For Grumman to successfully maintain Count XIII, which alleges interference with advantageous relations, it must "plead and prove at least some improper motive or improper means" on the part of Data General in its interfering activity. *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 817, 551 N.E.2d 20, 24 (1990) (citing *Blake v. Levy*, 191 Conn. 257, 262, 464 A.2d 52 (1983)).

Data General argues that Grumman has introduced no evidence showing that it acted improperly and is thus entitled to summary judgment on this count.

Grumman has produced evidence in the form of testimony from former Data General employees and employees of two potential customers stating that Data General threatened to cancel contracts and other benefits which it had afforded its customers if those customers awarded any service business to Grumman, that Data General employees stated that Grumman had no legal right to use ADEX, and that without ADEX Grumman could not properly maintain the customers' MV computers. The crux of Grumman's claim is that Data General employees had misrepresented to Grumman's potential customers that Grumman lacked the technical expertise to maintain MV computers.

The parties apparently agree that a firm which had the use of MV/ADEX was far better situated to perform maintenance and repair of MV computers than a firm which was denied the use of that tool at the time the alleged misrepresentations took place. The question is whether the alleged statements rose to the level of fraudulent representation. "[A] representation is fraudulent when, to the knowledge or belief of its utterer, it is false in the sense in which it is intended to be understood by its recipient." Restatement (Second) of Torts, § 767 cmt. c. The determination of whether the alleged statements which were made to Grumman's prospective customers constituted a fraudulent representation should be made by a fact finder. This determination is necessarily dependent on the exact words used and the specific intent of the utterer and as such is not appropriately decided as a matter of law. There is no question that a finding that Data General had made fraudulent representations would suffice as an "improper means" under *Geltman;* therefore summary judgment is not appropriate on this count.

Data General also argues that it is entitled to summary judgment because Grumman has not demonstrated that it suffered any damages as a result of Data General's alleged interference. However, Grumman has produced testimony by Charles Davis, its director of sales, in which he stated that Grumman lost substantial business with the two companies (AMI/PHS and S.A. Levitz/G.E. Retail) with whose advantageous relations Data General allegedly interfered. This is also a contested issue of fact appropriate for trial and summary judgment should be denied.

### F. Counterclaims XIV, XV, and XVI

Grumman represents that it will not pursue Counts XIV and XV. Consequently, summary judgment is granted to Data General on those counts. Grumman has not opposed Data General's motion for summary judgment on Grumman's unfair competition claim, Count XVI of Grumman's Third Amended Counterclaim, except by rearguing against summary judgment on the Chapter 93A claim, Count XVII. Summary judgment is granted in Data General's favor on Count XVI for the reasons stated in its memorandum.

### G. Counterclaim XVII

Count XVII of the counterclaim alleges that the acts described in counts I through XVI are prohibited unfair and deceptive acts under Massachusetts law:

"Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." M.G.L. c. 93A § 2(a). Data General argues that it is entitled to summary judgment on this claim on grounds that because the alleged conduct did not occur "primarily and substantially" within Massachusetts, it fits into a statutory exemption from liability:

No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the Commonwealth.

M.G.L. c. 93A, § 11.

In *Clinton Hospital Association v. Corson Group, Inc.,* 907 F.2d 1260 (1st Cir.1990), our court of appeals relied on three factors used

by the Massachusetts Supreme Court in *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 473 N.E.2d 662 (1985) to determine whether activity occurred "primarily and substantially" in Massachusetts for purposes of 93A. The factors are first, "consideration of where the defendant committed the deceptive or unfair acts or practices," second, "where the defendant received and acted upon the deceptive or unfair statements" and third, "the situs of the plaintiff's losses due to the unfair or deceptive acts or practices." *Clinton Hospital*, 907 F.2d at 1265–66.

Grumman apparently does not contest that the second and third factors militate against a finding that the alleged acts occurred primarily and substantially within Massachusetts. However, its theory is that the first factor, the place where the defendant allegedly committed the deceptive acts, is controlling, and since Data General's strategies and policies were developed in its corporate headquarters in Massachusetts, the location of the deceptive or unfair acts was Massachusetts.

In considering the first factor of place, in *Clinton Hospital* the court emphasized that the defendant's offensive acts should be considered to have taken place not only where the acts began, but also where "it was intended that their force and input influence the plaintiff's behavior" *Id.* at 1265. In *Bushkin Associates, supra*, an allegedly deceptive course of conduct which emanated from a company's Massachusetts headquarters was implemented by way of a telephone call made from Massachusetts. The court held that these facts alone were not enough for a finding that the conduct was primarily and substantially within Massachusetts.

Taking all of Grumman's allegations as true, as I must for purposes of this motion, I cannot infer that Data General's wrongful conduct occurred "primarily and substantially" within Massachusetts under c. 93A, even if Data General masterminded the entire alleged plot at home. It was intended that the force and input of their behavior be felt primarily in California and elsewhere in the United States, not in Massachusetts. Additionally, Grumman received and acted upon the deceptive or unfair statements primarily

outside of Massachusetts. Finally, the situs of Grumman's losses were either at customer sites or Grumman's home, not in Massachusetts. Since none of the three *Clinton Hospital* factors weigh in favor of a finding that the alleged acts occurred primarily and substantially within Massachusetts, Grumman cannot prevail on this count.

## IV Consolidation

◼ Finally, Grumman's counsel, in his capacity as lead counsel in the case of *Computer Products & Repair, Inc. v. Data General, et al.*, Civil Action No. 89–0357–S ("CPR"), moves for consolidation of that action with this one pursuant to Fed.R.Civ.P. 42(a). CPR, like Grumman, is a third party maintainer of Data General computers. CPR's complaint contains some claims which are substantially identical to counterclaims already being litigated in this action, such as the claim that Data General illegally tied its maintenance and repair service to ADEX. Other claims are similar to counterclaims in this action, but will require separate factual inquiry. For instance, CPR claims that Data General interfered with CPR's relationships with fifteen actual or prospective customers, all different entities from the two companies concerning which Grumman makes a similar claim. Many of the claims in the CPR action involve claims substantially identical to those which have been dismissed from the Grumman action, after motion and briefing by the parties. Data General opposes the motion to consolidate, arguing that judicial economy and fairness to the litigants would be better served by allowing the actions to remain separate.

Fed.R.Civ.P. 42(a) allows for the consolidation of cases in which common questions of law or fact are before the court. If there are such issues, the court should "weigh the prospective benefits of consolidation, in terms of convenience to the parties and judicial economy against the extent of any confusion, delay or prejudice that might result from consolidation." *Spirt v. Teachers Ins. and Annuity Ass'n,* 93 F.R.D. 627, 639 (S.D.N.Y.1982).

Although there are common issues of fact and law in these cases, I do not believe that convenience or economy will be served by

488

consolidation. This case is ready for trial. Allowing CPR's motion would entail reopening discovery, renewing motion practice, and adding issues to an already complex case. If Grumman should prevail after trial on some of the claims which it shares with CPR, CPR may have an opportunity to successfully argue that Data General is collaterally estopped from arguing those issues against CPR. On the other hand, if Data General should prevail in the present action, CPR may be able to have another bite at the pomegranate and relitigate the entire matter. Although a second trial, if necessary, would not be free of cost to the litigants or to the judiciary, I believe that on balance fairness to the litigants and preservation of scarce judicial resources require that in the exercise of my discretion I decline to consolidate these cases.

## V Conclusion

Accordingly, Grumman's motion for partial summary judgment on the issue of post-injunction damages is denied. Data General's motion for contempt is denied subject to renewal after trial. Data General's motion for partial summary judgment on Grumman's counterclaims is allowed with respect to Counts I, II, V, VI, IX, XI, XIV, XV, XIV, and XVII and denied with respect to Count XIII of Grumman's Third Amended Counterclaim. Grumman's cross-motion for partial summary judgment on Data General's copyright infringement claim is denied. CPI's motion to consolidate Civil Action 89–0357–S with the present action is denied. Grumman's Fifth, Sixth, Seventh, Eighth, Nineteenth, Twenty–First, Twenty–Second, and Twenty–Third affirmative defenses to Data General's claims are stricken. Grumman is ordered to insure that it complies fully with the terms of the preliminary injunction of December 29, 1988, pending final disposition of this matter.