**DATA GENERAL CORPORATION and Data General Service, Inc., Plaintiffs,**

**v.**

**GRUMMAN SYSTEMS SUPPORT CORPORATION, Defendant.**

**Civ. A. No. 88–0033–S.**

United States District Court,
D. Massachusetts.

Feb. 27, 1991.

---

Robert S. Frank, Jr., Kevin P. Light, Choate, Hall & Stewart, Boston, Mass., for plaintiffs.

Ronald S. Katz, Gary L. Benton, Coudert Bros., San Francisco, Cal., Paul E. Ware, Jr., David J. Apfel, Goodwin, Procter & Hoar, Boston, Mass., for defendant.

## ORDER AND MEMORANDUM ON DATA GENERAL'S MOTION FOR SUMMARY JUDGMENT ON GRUMMAN'S ANTITRUST COUNTERCLAIMS, AND GRUMMAN'S MOTION FOR EXPENSES AND FEES

SKINNER, District Judge.

Data General (DG) sells computer systems and provides services for their maintenance and repair. Grumman Systems Support (Grumman) provides services for the maintenance and repair of numerous computer systems, including those manufactured by DG. Grumman is a Third Party Maintainer (TPM) of equipment manufactured by other firms.

DG brought this action for damages and injunctive relief against Grumman's use of a diagnostic program developed by DG. The program, MV/ADEX, is used both to design DG's computer systems and to diagnose and repair systems in use. I entered a preliminary injunction against the use of the program by Grumman on December 29, 1988.

### Data General's Motion for Summary Judgment on Grumman's Antitrust Counterclaims

Grumman has counterclaimed against DG. Five of the counterclaims—Count V (Monopolization), Count VI (Attempt to Monopolize), Count VII (Conspiracy to Monopolize), Count VII (Unlawful Tie-in) and Count IX (Refusal to Deal)—allege violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2. DG has moved for summary judgment on these antitrust counterclaims.

The party moving for summary judgment must affirmatively demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The opponent, on the other hand, "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (citation omitted). An issue is "genuine" if a reasonable finder of fact could find for the opponent on the evidence presented, and "material facts" are those that might affect the outcome of the litigation under the applicable substantive law. *Id.* The court must view the record in the light most favorable to the opponent of the motion and must indulge all inferences favorable to that party. *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 105 (1st Cir.1988). However, "[t]he evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial." *Mack v. Great Atlantic and Pacific Tea Co., Inc.*, 871 F.2d 179, 181 (1st Cir.1989). In the context of antitrust claims, the Supreme Court has further concluded that

[i]t follows from these settled principles that if the factual context renders respondents' claim implausible—if the claim is one that simply makes no economic sense—respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary.

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## I. *Monopolization*

The monopolization claims are governed by the standard articulated in *United States v. Grinnell Corp.*, 384 U.S. 563, 570, 86 S.Ct. 1698, 1703, 16 L.Ed.2d 778 (1966): "[t]he offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." DG asserts that Grumman has failed to raise a question of material fact as to each of these requirements.

### A. Power in the Relevant Market

On the question of monopoly power in the relevant market, DG has presented evidence that it sells less than 5% of computer systems and that purchasers of computer systems are price-conscious and conscious of maintenance costs in assessing the long-run price of the system. Consequently, DG concludes that it can not extract monopoly rents in the repair market because purchasers will abandon its product. Grumman asserts to the contrary that the owner of a DG computer system has no alternative but to look to a maintainer of DG computers for repairs. DG controls 90% of the repair services for DG computers.

 Although questions of what constitutes the relevant market often are discussed in terms of questions of cross-elasticity and market and sub-market, the fundamental inquiry is what market or consumer decision the alleged monopolist must control in order to extract monopoly rents. In this context, the inquiry demands a determination of whether DG must control the sale of computer systems, which it clearly does not, in order to extract monopoly rents. To determine whether its monopoly share of the support services market is sufficient, the trier of fact must measure the ability of purchasers to assess the cost of maintenance, their price sensitivity, and their ability to change computer systems if monopoly rents are charged. The evidence introduced by Grumman, including the testimony of its economics expert, creates a material issue of fact as to whether DG is able to exert monopoly power. *See Service & Training, Inc. v. Data General Corporation*, 737 F.Supp. 334, 343–344 (D.Md.1990); *Image Technical Service, Inc. v. Eastman Kodak Co.*, 903 F.2d 612, 616 (9th Cir.1990). Although Judge Posner, in a tie-in case, makes a powerful argument that a small player in the manufacturing sector is unable to extract monopoly rents in the repair sector, his dissent is largely directed at the failure of the jury to address market power in the tying product. *Parts and Electric Motors, Inc. v. Sterling Electric, Inc.*, 866 F.2d 228 (7th Cir.1988) (Posner, J., dissenting). The structure and demand in the computer systems and support services markets cannot be determined without weighing the credibility of the evidence.

### B. Exclusionary Conduct

 The second element of the *Grinnell* test is an exclusionary practice. Although the initial wording of the test refers to the state of mind of the monopolist, Justice Douglas concludes with a conduct-based test: distinguishing the unlawful activity from "growth or development as a consequence of a superior product, business acumen, or historic accident." As Professor Areeda says, the businessperson may shout his cravings for monopoly from the roof tops before achieving it and no violation of the Sherman Act will have occurred. P. Areeda, *Essential Facilities: An Epithet in Need of Limiting Principles*, 58 Antitrust L.J. 841, 845 (1989). Intent is not enough. Some bad act or exclusionary

practice must be performed, although intent may be an indicator of the function of business conduct. *See Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370, 379 (7th Cir. 1986).

■ Viewing the evidence in the light most favorable to Grumman, DG had previously promoted the development of TPMs to service its computers. Before 1985, Grumman purchased software diagnostics, schematics, engineering change orders, upgrades and updates, and spare parts from DG. Additionally, Grumman enrolled its field engineers in DG's training classes and purchased DG's depot repair services.

Around 1985, several changes occurred in DG's support services program. DG had developed the diagnostic MV/ADEX. It licensed this tool only to those purchasers of DG computer systems in its CMO program (Cooperative Maintenance Organization). The CMO program was designed to service those owners of DG computers who are capable of self-maintenance and for whom DG service support was not competitive. The program could provide better service to the purchaser for a variety of reasons, including remoteness of the purchaser from a DG Service Center or the purchaser's technical sophistication. DG does allow participation in CMOs to owners of DG computer systems who are also TPMs. These TPMs, such as General Electric, are not allowed to use the technology gained from DG for the repair of other computers. Grumman and a sister subsidiary, which is an owner of DG computer systems, have been denied access to the CMO program. Grumman characterizes the CMO program as a method to enter the market for the sale or licensing of diagnostic software, while excluding their use by TPMs.

The TPMs no longer are able to get the advanced training classes that are available only to CMOs. The same change has occurred in the availability of repair services for parts, known as depot repair services; of "rev-ups", the collective name for engineering change orders, upgrades, and updates; of schematics; and of spare part sales. The extent of the reduction of their availability is unclear and in dispute between the parties. I will assume that MV/ADEX, training, depot repair services, rev-ups, and spare parts are not available to Grumman and other TPMs, other than as participants as CMOs for their own DG computers.

All owners of DG computers may purchase training, depot repair services, rev-ups, and spare parts directly from DG, regardless of whether their computers are serviced by DG, TPMs, or themselves. It is unclear whether licensees of MV/ADEX through the CMO program may additionally purchase the services of a TPM and still remain in the program. Consequently, for the purposes of the motion, I will assume that licensees of MV/ADEX through the CMO program may not hire a TPM, but that all owners of DG systems may purchase all available services except MV/ADEX from DG regardless of who maintains their computers. TPMs are excluded from purchasing any of these services except as required to maintain their own DG computers.

■ In addition, Grumman maintains that DG engaged in illegal and unscrupulous acts to "win back" customers. These methods are alleged to include calling TPMs pretending to be customers in order to discover their price lists; making inaccurate promises to customers about DG's service capabilities; telling customers that TPMs' service personnel were former employees of DG who were not competent at their jobs; insinuating to customers that TPMs were in financial trouble; and declaring that TPMs could not service the computers because they did not have access to MV/ADEX. While business torts and deception are of concern, their relevance to the exertion of monopoly power is more limited. Whereas derisive comments about competitor employees and financial conditions and "dirty tricks" to gain information from the TPMs make it more difficult to compete against the monopolist, these actions have minimal connection to the monopolist's exercise of exclusionary powers.

*See* 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 738a, at 278 (1978).

Grumman's argument that an exclusionary practice exists is based on *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985) and the essential facilities cases such as *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973). *Aspen* was not an essential facilities case, but involved the changed relationship between the two companies controlling the ski areas in the town of Aspen. Skiing Co. controlled three of the mountains, while Highlands controlled only one. In their cooperative years, Skiing Co. and Highlands offered an all-Aspen six-day lift pass that was usable at all four mountains. The two firms divided the revenue from the lift ticket in ratio to their use at each mountain. Highlands collected around 17% of the revenue based on attendance at its mountain. The six-day pass was popular because it was sold at a discount from the single-day tickets, many skiers stayed for a six-day period, skiers did not have to return to the ticket window each day, and they could ski the greatest diversity of terrain. In addition to the all-Aspen six-day pass, both Skiing Co. and Highlands also offered single, three-day and six-day tickets usable only at their respective mountains. Skiing Co.'s six-day ticket, usable at three mountains, was outsold two to one by the all-Aspen ticket.

Skiing Co. then changed its policy and made it prohibitive for Highlands to issue the all-Aspen six-day ticket. Skiing Co. also withdrew its three-day ticket and offered only a six-day ticket for its mountains, so that the only choice for skiers who wanted to ski at the three mountains was to buy the six-day pass or single-day tickets. This restriction was significant, since most skiers stayed in Aspen for a week and if they wanted to ski all four mountains, they could do so only by purchasing individual tickets. Highlands offered to pay for an accounting firm to monitor the use of the joint six-day ticket, so that the division of the revenues could be as accurate as possible. It then offered its own six-day "Adventure Pack," which contained a three-day pass at Highlands and three vouchers, each equal to the price of a daily ticket at a Skiing Co. mountain. The vouchers were guaranteed by funds on deposit in an Aspen bank and redeemable at face value with Aspen merchants, but Skiing Co. refused to accept them. Skiing Co. refused to sell single-day tickets at retail price directly to Highlands. Only when Highlands replaced the vouchers with American Express Traveler's Checks, which were not identifiable as originating from Highlands, was Skiing Co. forced to accept them.

In *Aspen*, the Court found the conduct of Skiing Co. to be exclusionary. The Court placed emphasis on the consumers' desire for the product, the refusal of Skiing Co. to accept the order of single-day tickets by Highlands, the refusal of Skiing Co. to accept the fully backed vouchers, and the general availability around the country of multi-area passes that competed with single-area tickets. Consequently, the Court concluded that Skiing Co.'s conduct not only "tends to impair the opportunities of rivals, but also either does not further competition on the merits or does so in an unnecessarily restrictive way." 472 U.S. at 605 n. 32, 105 S.Ct. at 2859 n. 32 (citing 3 P. Areeda & D. Turner, *Antitrust Law* 78 (1978)).

Grumman insists that *Aspen* is analogous to this case. DG had a cooperative policy with TPMs which fostered competition. It then broke off the policy of licensing all diagnostics and selling spare-parts and other support services directly to TPMs. It will now sell those products only to owners of DG systems for use on their own systems. In the sense that *Aspen* addresses the issue of prior promotion of competition in a market that is later halted, this case is analogous. Numerous points, however, differentiate the cases.

DG developed the diagnostics, training, and other services to support the owners of DG equipment. It offers all the services, except MV/ADEX, to the owners regardless of whom they use for maintenance. In *Aspen*, the consumer was denied the use of the fully financed vouchers in the "Adventure Pack" by Skiing Co. merely because the skier would ski Highlands during the

vacation. In this case, DG will sell its service products, except the copyrighted diagnostic MV/ADEX, to any ultimate consumer regardless of whether they now or later use a TPM. No "quasi-exclusive dealing" is present.

Grumman and other TPMs have the opportunity to develop competing diagnostics and tools for maintenance. Two diagnostics have, in fact, been developed by TPMs. Grumman asserts that these competing diagnostics are not functionally equivalent to MV/ADEX in such capacities as formatting Argus disks. The Navy, in accepting bids for a maintenance contract, rejected Grumman's bid because of the shortcomings of the competing diagnostics. Naturally, the manufacturer has significant advantages in developing the maintenance services. DG knows the system before it is released to the public and can begin development of a diagnostic earlier; it has immediate contact with the owner, who will need maintenance in the future; and it has name recognition. While these advantages create significant barriers for TPMs, according to Justice Douglas they represent historic accident—the natural benefit of being a manufacturer. *See also Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2nd Cir. 1979).

Grumman protests that it is unable to produce a diagnostic because it cannot get the necessary schematics and DG could easily drive any competing diagnostic into obsolescence by simple modifications in design. In protecting any secret in the design of its computers, DG may normally limit the number of schematics that it sells to the owners of its equipment. The accusation that DG can easily thwart TPMs from developing competing diagnostics is serious. The courts have recognized such behavior of shifting the configuration of hardware to suppress the competition as an exclusionary practice. *See Digital Equipment Corp. v. System Industries, Inc.*, slip op., 1990 WL 5588 1990 U.S. Dist. LEXIS 715, 1990–1 Trade Cases (CCH) ¶ 68,901 (D.Mass. January 16, 1990); *California Computer Products, Inc. v. International Business Machines Corp.*, 613 F.2d 727 (9th Cir.1979). Grumman, however, makes no allegations that DG has in fact attempted to subvert competitors' efforts to develop and implement competing diagnostics. TPMs have demonstrated the ability to develop diagnostics, even if they are not as efficient as MV/ADEX.

Consequently, this case differs from *Aspen* in the following respects: 1) DG will sell its services, except MV/ADEX, to ultimate consumers regardless of who performs their maintenance; 2) TPMs, unlike Highlands, are able to develop service packages that allow competition; and 3) with the exception of its restrictive licensing of MV/ADEX, DG does not engage in any "quasi-exclusive dealing." *See* P. Areeda, *Essential Facilities: An Epithet in Need of Limiting Principles*, 58 Antitrust L.J. at 848–851.

■ In addition to arguing that *Aspen's* proscription against changing a cooperative policy merely to drive the competition out governs this case, Grumman argues that MV/ADEX is an essential facility which DG must share with its competitors. Ordinarily, there is no limitation on a company's freedom to generate its own intellectual property, but grants of exclusionary power, such as a copyright, are not without limits. *See SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1207 (2d Cir.1981). The crux of Grumman's essential facilities argument is that only the manufacturer of computer systems is capable of developing a diagnostic tool which is an essential device in the repair of those computers. The leading essential facilities case in the monopoly area is *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973). In that case, the Supreme Court did not create a new test for determining when a monopolist may refuse to sell an essential facility, but continued to apply the general prohibition against unlawfully foreclosing competition. 410 U.S. at 377, 93 S.Ct. at 1029 (citing *United States v. Griffith*, 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948)). Our court of appeals briefly addressed the issue and viewed the developing doctrine in a restrictive light. *Interface Group, Inc.*

*v. Mass. Port Authority*, 816 F.2d 9 (1st Cir.1987):

> The doctrine aims to prevent a firm with monopoly power from extending that power "from one stage of production to another, and from one market to another." *MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1132 (7th Cir.1983), *cert. denied* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983).

*Interface*, 816 F.2d at 12. The court in *MCI* set out a four-part test for the doctrine: 1) control of the essential facility by a monopolist; 2) a competitor's inability practically or reasonably to duplicate the essential facility; 3) the denial of the use of the facility to a competitor; and 4) the feasibility of providing the facility. The *MCI* test obviously cannot be applied blindly to monopolists who hold intellectual property rights. Otherwise, the balance struck in *SCM* will be upset and every significant patent or copyright will be deemed an essential facility.

Both *MCI* and *Otter Tail* involve legally regulated monopolists who refused the plaintiff access to a distribution network. By refusing access to the plaintiff, the defendant attempted to gain monopoly power in second markets, long-distance telephone communications and local electricity distribution, respectively. The theory of these cases and *United States v. Terminal Railroad Assoc.*, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912) (a § 1 case) has been characterized as a "bottleneck." *See MCI*, 708 F.2d at 1132. The bottleneck which DG is alleged to control is the understanding of its own computer systems. Presumably, if TPMs were provided with all the schematic information about the system, they would be able to produce a diagnostic that is as fully capable as MV/ADEX. It is DG's position as the manufacturer that allegedly gives it the capability to produce the alleged essential facility. The case law has consistently affirmed that a manufacturer is under no obligation to pre-disclose or disclose its knowledge about its products so that competition may arise in the related peripheral hardware, software, and repair services markets. *See Berkey Photo v. Eastman*

*Kodak, supra.* The underlying thrust of Grumman's essential facilities claim is that if it cannot force DG to share its knowledge, the essential facilities doctrine requires DG to share the fruits of its knowledge. As the First Circuit stated in a different factual context, "[t]his view of the essential facilities doctrine, however, considerably overstates its scope." *Interface*, 816 F.2d at 12. DG does not have monopoly power in the sale of computer systems and thus is not using a bottleneck to create another monopoly. The "bottleneck" of its superior knowledge in the design of DG computers is insufficient to invoke the essential facilities doctrine; a better mousetrap is not necessarily an essential facility. The Sherman Act has not been interpreted to require manufacturers to abandon their advantage in creating accessories to their systems. If manufacturers of complex and innovative systems were required to share with competitors the development of accessories, because they had a possibly absolute advantage through producing the system, the incentives of copyright and patent laws would be severely undermined. Not only would the manufacturer, who is in the best position to create these accessories, have less incentive to do so, but also the impetus for competitors to reverse engineer and produce competing solutions would be reduced.

Even though I conclude that there is a material issue as to market power, Grumman has not asserted any facts that would indicate that DG has engaged in any unlawful exclusionary conduct, Count V (Monopolization), Count VI (Attempt to Monopolize), Count VII (Conspiracy to Monopolize), and Count IX (Refusal to deal) do not survive the motion for summary judgment.

## II. *Unlawful Tie-in*

■ Grumman asserts that DG used its market power in MV/ADEX (the tying product) to force consumers to purchase DG's repair services (the tied product). This argument presents a different facet of the story presented by Grumman that DG, as a manufacturer, is in a superior informa-

tional position and is unlawfully exploiting its position to extend market control. A consumer may obtain the use of MV/ADEX in only two ways: by employing DG's repair services or by joining DG's CMO program. To join the CMO program, the consumer must do its own maintenance and not hire a TPM. As stated above, I have assumed that the owner of DG systems cannot obtain MV/ADEX and also employ a TPM.

DG opposes the claim on several grounds, including the fundamental question of whether MV/ADEX and DG repair services are different products. DG makes the superficially appealing argument that the use of MV/ADEX by DG's technicians is no different from the use of a saw by a carpenter, merely an efficient tool of the service. This analysis was apparently accepted by the United District Court in *Service & Training, Inc. v. Data General Corp.*, 737 F.Supp. at 342–343, a case involving the same diagnostic device, MV/ADEX. That court took the apparent position that because MV/ADEX was only useful in connection with the servicing of computer equipment, that service and MV/ADEX constituted a single product. The same could be said with respect to the products considered in the seminal tying cases. *See Motion Picture Patents Co. v. Universal Film Co.*, 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871 (1917) (film projector and film); *International Business Machines Corp. v. United States*, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085 (1936) (tabulators and tabulator cards); *International Salt Co. v. United States*, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947) (salt machine and salt). In point of fact, the history of this case demonstrates that MV/ADEX is useful and desired by CMO's, which bought the MV/ADEX as a separate unit without engaging DG's maintenance service.

The Supreme Court has addressed the practical manner in which products can be differentiated. *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984); *see also Key Enterprises v. Venice Hospital*, 919 F.2d 1550 (11th Cir.1990). The case involved the sale to patients of general hospital services (the tying product) and anesthesiological services (the tied product). The hospital required patients to use the anesthesiologist with which it had contracted to provide exclusive service. The Court did not view the anesthesiologist as another tool involved in providing hospital care. Instead the Court looked to various practical indications of whether the package of services "force[d] the buyer into the purchase of a tied product that the buyer did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish*, 466 U.S. at 12, 104 S.Ct. at 1558. Although DG offers a business justification for not doing so, the CMO program and Grumman's prior use of MV/ADEX demonstrate the feasibility of offering the products separately. In *Jefferson Parish*, the Court also noted that the tied product was billed separately and that "ample and uncontroverted testimony" demonstrated that surgeons and patients requested specific anesthesiologists to come to the hospital. Grumman has provided some evidence that owners of DG systems have requested a license for MV/ADEX and desired to have a TPM use it on the DG system. No evidence of separate billing for MV/ADEX outside of the CMO program is present. Grumman, however, has presented evidence that DG licenses all of its other diagnostics separately. This evidence creates a material issue of fact as to whether DG repair services are being forced on the owner of DG systems. *See Image Technical Service*, 903 F.2d at 615–616. Additionally, with the availability of alternative diagnostics through TPMs, a question of material fact exists as to whether DG has market power in the licensing of diagnostics with the capability of MV/ADEX. The test under *Jefferson Parish* also allows a business justification defense. DG has asserted that the ability of MV/ADEX to design computer systems, in addition to repairing them, requires that it keep it out of the market. Grumman, however, has presented evidence that contrary to DG's assertion, it has been lax in preserving the secrecy of the software at sites where it is used.

I am of the opinion that there is a genuine dispute as to the material facts supporting Grumman's assertion of an illegal tie-in.

█ If liability is established, the focus of equitable remedial measures and damages under a tie-in claim will be different from relief under an essential facilities claim. An essential facilities claim would mandate cooperation between the competitors, in this case requiring licensing of MV/ADEX to TPMs. Unless broader relief is required for some divestiture of DG's service business, equitable relief for a tie-in claim would be limited to precluding the tie in licensing of MV/ADEX to the computer owners. DG would not be under an independent duty to license its better mousetrap to TPMs. *See* 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 733f, at 260 (1978); *Olympia Equipment Leasing Co. v. Western Union Tel. Co.*, 797 F.2d at 380.

### III. *Conclusion*

Accordingly, Data General's motion for summary judgment is allowed as to Count V (Monopolization), Count VI (Attempt to Monopolize), Count VII (Conspiracy to Monopolize), and Count IX (Refusal to Deal) of Grumman's Counterclaims and denied as to Count VII (Unlawful Tie-in) of Grumman's Counterclaims.

*Grumman's Motion for Expenses and Fees*

█ Grumman has moved for expenses and attorneys' fees pursuant to Fed.R. Civ.P. 56(g). Grumman asserts that the affidavits of Roger MacNaughton submitted by DG contradict prior testimony and were submitted in bad faith. In all Mr. MacNaughton's testimony, he states that he bases his judgment on his experience working in the computer maintenance industry. He consistently states that he is not an economics expert. The apparent contradiction arises from his conclusions as to whether he believes himself to be an expert in market definition. Since his expertise arises from industry experience and not from academic economic analysis, Mr. MacNaughton sometimes does conclude and at other times does not conclude that he is an expert in market definition. Testi-

mony about the pricing mechanisms actually employed in an industry, however, may be as or more useful than multitudes of theoretical cross-elasticity graphs.

The recently raised dispute over the factual allegations in his various affidavits raises issues of fact to be determined at trial.

Accordingly, Grumman's motion for expenses and fees is denied.