**SERVICE & TRAINING, INCORPO-
RATED; Robert J. Montgomery,
Plaintiffs–Appellants,**

v.

**DATA GENERAL CORPORATION; Data
General Services, Incorporated, Defen-
dants–Appellees.**

No. 90–1501.

United States Court of Appeals,
Fourth Circuit.

Argued March 3, 1992.

Decided May 6, 1992.

**682**

Dov Apfel, Hoffman, Apfel & Lyons, Rockville, Md., argued (M. Robin Davis, on brief), for plaintiffs-appellants.

Robert S. Frank, Jr., Choate, Hall & Stewart, Boston, Mass., argued (Kevin P. Light, Choate, Hall & Stewart, Boston, Mass., Francis B. Burch, Jr., Piper & Marbury, Baltimore, Md., on brief) for defendants-appellees.

Before RUSSELL and LUTTIG, Circuit Judges, and SIMONS, Senior United States District Judge for the District of South Carolina, sitting by designation.

## OPINION

LUTTIG, Circuit Judge:

Appellants Service & Training, Inc., and Robert J. Montgomery brought antitrust and copyright actions against Data General Corporation and Data General Services, Inc., in the United States District Court for the District of Maryland. The district court awarded summary judgment in favor of Data General and preliminarily enjoined the appellants' continued use and copying of Data General's copyrighted software. For reasons different from those relied upon by the district court, we affirm the court's grant of summary judgment.

### I.

The relevant facts are detailed in the opinion below, *Service & Training, Inc. v. Data Gen. Corp.*, 737 F.Supp. 334 (D.Md. 1990), and we summarize them only to the extent necessary for the disposition of this appeal.

Defendant-appellee Data General designs, manufactures, and sells large-scale computer systems.[1] Data General developed, manufactured, and copyrighted a diagnostic software program called "MV/Advanced Diagnostic Executive System" (MV/ADEX), which is used in designing and manufacturing Data General's MV series of computers and in diagnosing malfunctions in MV computers. Plaintiff-appellant Service & Training, Inc. (STI), maintains and repairs Data General computer equipment and peripheral equipment that is manufactured by other companies and used by Data General equipment customers. STI is known as a "third-party maintenance company" (TPM) because it services computers that it does not manufacture.

---

1. We refer to Data General Corporation and its servicing subsidiary, Data General Services, Inc., herein as "Data General."

On July 24, 1989, STI instituted a declaratory judgment action in the United States District Court for the District of Maryland, asserting rights under a 1976 settlement agreement between Data General and plaintiff-appellant Robert J. Montgomery[2] to use MV/ADEX in its servicing of Data General computer equipment. In the same action, STI alleged that Data General had violated sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. Data General counterclaimed, alleging copyright infringement by STI. STI then moved for a preliminary injunction barring Data General from communicating to third parties that STI is not authorized to use MV/ADEX. Data General thereafter moved for a preliminary injunction barring STI from using MV/ADEX and requiring STI to return to Data General any copies of the software still in STI's possession. The parties also filed crossmotions for partial summary judgment. After a seven-day evidentiary hearing, the district court consolidated the cross-motions for preliminary injunction with the cross-motions for summary judgment. It entered summary judgment for Data General on STI's claims under the 1976 agreement and section 1 of the Sherman Act,[3] granted Data General's motion for a preliminary injunction, and denied STI's cross-motion. *See* 737 F.Supp. at 335–36, 344–45. This appeal followed.

## II.

Appellants contend that Data General's "refusal to sell or license MV/ADEX to all customers, including TPMs, and its decision to require customers who want access to MV/ADEX to purchase support services from [Data General], amounts to a *per se* unlawful tying arrangement" under section 1 of the Sherman Act, Appellants' Br. at 19, and that the district court erred in granting summary judgment in Data General's favor on their tying claim.

■ "[C]ertain tying arrangements pose an unacceptable risk of stifling competition and therefore are unreasonable *per se.*" *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 9, 104 S.Ct. 1551, 1556, 80 L.Ed.2d 2 (1984). To establish a *per se* tying claim under section 1, a plaintiff must prove (1) the existence of two separate products,[4] (2) an agreement conditioning purchase of the tying product upon purchase of the tied product (or at least upon an agreement not to purchase the tied product from another party),[5] (3) the seller's possession of sufficient economic power in the tying product market to restrain competition in the tied product market,[6] and (4) a not insubstantial impact on interstate commerce.[7] *See generally Jefferson Parish*, 466 U.S. at 12–16, 18–21, 104 S.Ct. at 1558–60, 1561–63. Appellants thus must prove that a genuine issue of material fact exists as to each of these four elements of a *per se* tying claim, if they are to prevail against Data General's summary judgment motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). We conclude that appellants have failed to raise a genuine issue of material fact as to the existence of a tying agreement.[8]

**2.** The 1976 agreement settled Data General's suit against Montgomery, the vice-president of STI and a former Data General employee, for alleged misappropriation of confidential information.

**3.** The district court's disposition of appellants' section 2 claim is not before this court.

**4.** *See, e.g., Times–Picayune Publishing Co. v. United States*, 345 U.S. 594, 613–14, 73 S.Ct. 872, 883, 97 L.Ed. 1277 (1953).

**5.** *See Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518–19, 2 L.Ed.2d 545 (1958).

**6.** *See, e.g., United States Steel Corp. v. Fortner Enters., Inc.*, 429 U.S. 610, 620, 97 S.Ct. 861, 868, 51 L.Ed.2d 80 (1977); *United States v. Loew's Inc.*, 371 U.S. 38, 45, 48 n. 5, 83 S.Ct. 97, 102, 103 n. 5, 9 L.Ed.2d 11 (1962).

**7.** *See, e.g., International Salt Co. v. United States*, 332 U.S. 392, 396, 68 S.Ct. 12, 15, 92 L.Ed. 20 (1947).

**8.** We need not and do not address Data General's arguments that it lacks "sufficient market power in the tying product" to impose an unlawful tie, Appellees' Br. at 42; that "a valid business justification" exists even assuming there is an otherwise illegal tying activity, *id.* at 49 n. 35;

### A.

The district court granted summary judgment against appellants on their tying claim on the ground that they had failed to present a question of material fact as to whether MV/ADEX and Data General's repair services are separate products. We disagree that summary judgment was warranted on this element of appellants' tying claim.

■ "[T]he answer to the question whether one or two products are involved turns not on the *functional relation* between" the two allegedly separate products, "but rather on the *character of the demand* for the two items." *Jefferson Parish*, 466 U.S. at 19, 104 S.Ct. at 1562 (emphases added); *see also id.* at 19 n. 30, 104 S.Ct. at 1562 n. 30. The purpose of the inquiry into consumer demand is to determine whether there are customers who would, absent an illegal agreement, purchase the tied product without the tying product, and the tying product without the tied product. That is, the object is to assess whether there is "sufficient demand for the purchase of [the tied product] separate from [the tying product] to identify a distinct product market in which it is efficient to offer [the tied product] separately from [the tying product]." *Id.* at 21–22, 104 S.Ct. at 1563.

■ The district court correctly recognized that whether or not there are two separate products depends upon the character of consumer demand for the products. 737 F.Supp. at 343 (citing *Jefferson Parish*, 466 U.S. at 19, 104 S.Ct. at 1562); *see also id.* at 343 n. 13 (stating the court's intent "to determine whether there exists a market for [MV/ADEX] separately and independently from the servicing of Data General computers"). The court, however, appears ultimately to have misapplied the "character of demand" standard. It found that "MV/ADEX is merely one feature of Data General's integrated and unified 'product'—computer servicing." 737 F.Supp. at 343. It then reasoned that because the "only ... legitimate *purpose* for which Data General's customers would use MV/ADEX [is] to maintain and repair computer systems," *id.* (emphasis added), "MV/ADEX and maintenance and repair service are inextricably bound together and cannot be considered to be separate and distinct from one another," *id.* This inquiry into purpose and use is indistinguishable from the inquiry into the "functional relationship" between products that was rejected in *Jefferson Parish*.

Applying properly the "character of demand" standard of *Jefferson Parish*, we believe, contrary to the district court's conclusion, that appellants have produced sufficient evidence of separate markets for MV/ADEX licenses and for repair services to withstand summary judgment on this ground. It was undisputed that a market existed for repair services for Data General computer equipment. The evidence that Data General licenses MV/ADEX to cooperative maintenance organizations (CMOs) without also selling repair services to these customers, *see* J.A. at 603–05, 1213, 2098, 2406, 3069; Appellees' Br. at 6 n. 9, 41 n. 31, constitutes evidence of a market for MV/ADEX licenses separate from that for repair services. (Members of CMOs are capable of servicing their own Data General computers and therefore do not purchase repair services from either Data General or a TPM.) Moreover, appellants introduced deposition testimony that Data General computer owners can and do distinguish between a license to use MV/ADEX and Data General's repair services. *See* J.A. at 1676, 1693–94, 1702. Such evidence of "two distinct markets for products that [are] distinguishable in the eyes of buyers" would support a reasonable inference that Data General might "have foreclosed competition on the merits in a product market distinct from the market for" MV/ADEX licenses. *Jefferson Parish*, 466 U.S. at 19, 21, 104 S.Ct. at 1562; *see also Data Gen. Corp. v. Grumman Sys. Support Corp.*, 761 F.Supp. 185, 193 (D.Mass.1991). The

---

and that appellants lack the "antitrust injury" that a private party must show in order to pursue a private antitrust suit, *see id.* at 36–37.

*See generally Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990).

district court therefore erred in awarding summary judgment on the ground that appellants had not presented a question of material fact as to whether MV/ADEX licenses and repair services are distinct products.[9]

## B.

■ Although the district court erred in concluding that appellants had not introduced sufficient evidence to withstand summary judgment on the issue of whether MV/ADEX licenses and repair services are separate products, we nonetheless believe that summary judgment for Data General was warranted because appellants have not raised a genuine issue of material fact as to the existence of a tying arrangement.[10] "Fundamentally, for there to be a violation of § 1 of the Sherman Act two or more persons must act in concert." *Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.*, 924 F.2d 539, 542 (4th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 64, 116 L.Ed.2d 39 (1991).[11] In this case, proof of an antitrust conspiracy requires evidence of a tying agreement pursuant to which Data General would "sell" MV/ADEX "only on the condition that the buyer also purchase[ ] a different (or tied) product"— Data General's repair services—or evidence of an agreement under which the buyer "at least agrees that he will not purchase [repair services] from any other supplier." *Northern Pac. Ry. Co. v. United States,*

356 U.S. 1, 5–6, 78 S.Ct. 514, 518–19, 2 L.Ed.2d 545 (1958); *accord Stephen Jay Photography, Ltd. v. Olan Mills, Inc.,* 903 F.2d 988, 991 (4th Cir.1990). Appellants have not produced sufficient evidence of either kind of agreement between Data General and its customers to withstand Data General's summary judgment motion.

■ There are two relevant classes of Data General customers: (1) CMOs that hold MV/ADEX licenses from Data General and (2) customers to whom Data General sells its repair services. To prevail against Data General's summary judgment motion based upon the absence of an antitrust agreement between Data General and either class of customers, appellants must produce evidence of an express tying agreement or evidence that affirmatively "tends to exclude the possibility" that Data General and its customers "were acting independently" in the sales and purchases of products. *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984); *accord Laurel,* 924 F.2d at 542; *Terry's Floor Fashions, Inc. v. Burlington Indus., Inc.,* 763 F.2d 604, 611–12 (4th Cir.1985). Absent an express agreement, if the actions of Data General and its customers are "as consistent with permissible competition as with illegal conspiracy," there will be no "inference of antitrust conspiracy." *Matsushita,* 475 U.S. at 588, 106 S.Ct. at 1356; *see also First Nat'l Bank v. Cities Serv.*

---

**9.** Appellants suggest in at least one place in their brief that the tying product is not licenses to use MV/ADEX, but rather "access to" MV/ADEX. *See* Appellants' Br. at 19; *cf. id.* at 23 ("availability of MV/ADEX"). If "access to" MV/ADEX and repair services are considered to be the products in question, appellants have clearly failed to produce sufficient evidence that the products are in fact separate. On the record before us, demand for mere "access to" MV/ADEX, in contrast to demand for licenses to use MV/ADEX, is indistinguishable from demand for repair services. Appellants have introduced no evidence that there are customers who would purchase MV/ADEX-assisted diagnostic services separately from all other repair services for Data General equipment. Appellants appear to recognize as much and refer to the two products simply as "MV/ADEX" and repair services, not "access to MV/ADEX" and repair services, in the portion of their brief in which they argue

that there are in fact two products. *See id.* at 22–26.

**10.** We may determine "whether summary judgment [can] be upheld on an alternative ground where the basis chosen by the district court proves erroneous." *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 363 (4th Cir.1985); *see also Charbonnages de France v. Smith,* 597 F.2d 406, 416 & n. 9 (4th Cir.1979).

**11.** Section 1 of the Sherman Act, by terms, proscribes only "contract[s], combination[s] . . ., or conspirac[ies] in restraint of trade." 15 U.S.C. § 1. Section 1 does not reach independent action. *See, e.g., Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 768, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984); *Monsanto Co. v. 6350 35 8 Spray–Rite Serv. Corp.,* 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984).

*Co.,* 391 U.S. 253, 278–80, 88 S.Ct. 1575, 1587–88, 20 L.Ed.2d 569 (1968).

■ Appellants introduced no evidence from which it could reasonably be inferred that Data General agreed to license MV/ADEX to CMOs only on the condition that the CMOs also purchase Data General's repair services. CMOs do not even purchase repair services; by definition, these customers repair their own computers. *See* J.A. at 3675. Appellants similarly failed to introduce any evidence that would support a finding that these customers agreed with Data General not to buy repair services from TPMs. The only arguably relevant evidence introduced by appellants on Data General's relationship with its CMO customers is that CMOs do not purchase repair services from TPMs or any other repair service provider. The fact that CMOs do not purchase repair services, however, is at least as consistent with the legitimate and independent business decision not to purchase unneeded services as it is with an agreement not to purchase such services.[12]

Appellants' evidence at bottom shows nothing more than a unilateral decision by Data General to license MV/ADEX to CMOs but not to others. The fact that

Data General has selectively licensed MV/ADEX is not evidence of an illegal tying agreement. Data General may lawfully license MV/ADEX to whomever it chooses. *See United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919); *see also Laurel,* 924 F.2d at 542 ("Generally, a business has the right to deal or not deal with whomever it likes, as long as it does so independently."). The owner of a copyright has an exclusive right to sell, rent, lease, lend, or otherwise distribute copies of a copyrighted work. *See* 17 U.S.C. § 106(3). Section 1 of the Sherman Act does not entitle "a purchaser ... to buy a product that the seller does not wish to offer for sale." *Jefferson Parish,* 466 U.S. at 24 n. 40, 104 S.Ct. at 1565 n. 40. We hold, therefore, that appellants have failed to raise a genuine issue of fact as to the existence of an antitrust conspiracy between Data General and its CMO customers.

■ Appellants similarly have failed to introduce evidence that Data General entered tying agreements with its service customers conditioning the licensing of MV/ADEX on the purchase of repair services from Data General. Data General does not license MV/ADEX to its service

---

**12.** In *Image Technical Serv., Inc. v. Eastman Kodak Co.,* 903 F.2d 612 (9th Cir.1990), *cert. granted,* —— U.S. ——, 111 S.Ct. 2823, 115 L.Ed.2d 994 (1991), *argued,* No. 90–1029, 60 U.S.L.W. 3463 (Dec. 10, 1991), a copier equipment manufacturer "entered into agreements with its equipment owners ... that it [would] sell parts only to users 'who service only their own [copier] equipment.'" *Id.* at 619 (quoting the manufacturer's "Terms of Sale"). The Ninth Circuit held that such agreements constitute impermissible tying arrangements. *See id.* We reject the reasoning underlying this holding. It simply does not follow from the fact that a seller agrees to sell product A only to a certain class of customers that it has necessarily conditioned the sale of product A on an agreement not to purchase product B from another seller, especially where, as here, the particular class of customers to whom product A is sold have no need to purchase product B. Thus, even if Data General's licensing agreements explicitly stated that it would license MV/ADEX only to customers "who service only their own ... equipment," we would not construe such a licensing limitation as evidence of an impermissible tying arrangement. Provided it does so unilaterally,

Data General may permissibly restrict MV/ADEX licenses to a particular class of customers.

The Ninth Circuit also concluded that characterizing licensing actions such as Data General's as "independent" under the authority of *Monsanto* essentially places "virtually all tying arrangements ... beyond the reach of Section 1," in contravention of the Supreme Court's tying cases. *Id.* at 619. We disagree. A seller's unilateral decision to sell only to certain customers has always been independent action outside the reach of section 1. *Cf. United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919); *Laurel,* 924 F.2d at 542–43. To the extent that the Ninth Circuit intended to suggest in this passage that *Monsanto* does not apply to section 1 tying claims at all, we disagree with that suggestion as well. Section 1 plainly requires a "contract, combination ..., or conspiracy." 15 U.S.C. § 1; *see Monsanto,* 465 U.S. at 761, 104 S.Ct. at 1469. If appellants are to establish an antitrust conspiracy, they must adduce evidence tending to prove that Data General's actions and its customers' responses to those actions were not independently undertaken.

customers in connection with its provision of repair services.[13] Data General does not even agree that it will use MV/ADEX when servicing customers' computers.

Even if we were to assume that the business arrangements between Data General and its service customers effected a licensing of MV/ADEX, appellants have failed to produce sufficient evidence that Data General has agreed with its service customers to provide MV/ADEX only on the condition that they purchase Data General's repair services. The written agreement between Data General and its repair service customers does not condition the provision of MV/ADEX upon the purchase of repair services from Data General.[14] The service agreement shows at most that Data General has sold repair services which incidentally may include the use of MV/ADEX by the company's field engineers in the course of fulfilling the service agreements.

■ Appellants have also failed to introduce evidence beyond the face of the service agreement that would support a finding that Data General has conditioned the provision of MV/ADEX upon the purchase of its repair services. Appellants proffered evidence that Data General has stated to potential service customers that only Data General was authorized to use MV/ADEX, see J.A. at 2207–09, 3675, 3678–80, that customers as a matter of fact have demanded that any provider of repair and maintenance services be able to use MV/ADEX, see id. at 2137, 2147–48, that customers have not purchased services from TPMs, who lacked authorization to use MV/ADEX, see id. at 2137–39, 2147–48, 2207, and that Data General has filed bid protests challenging service contracts awarded to TPMs on the grounds that TPMs lacked authorization to use MV/ADEX, see id. at 2112–26, 3637–57. This evidence, however, is ambiguous, and any inference from it that Data General and its service customers agreed that the customers would purchase unwanted Data General services as a condition to obtaining a license to use MV/ADEX would be speculative.[15] In short, this evidence does not tend to "exclude[ ] the possibility that the alleged coconspirators acted independently or based upon a legitimate business purpose" rather than pursuant to some form of tying agreement. *Laurel*, 924 F.2d at 543. It is entirely consistent with a conclusion that Data General lawfully extolled the superiority of its repair service due to its use of MV/ADEX and that customers independently concluded that they preferred Data General services using MV/ADEX over TPM services that do not use MV/ADEX. *Cf. Times–Picayune Publishing Co. v.*

13. Under Data General's "remote assistance program," *see* note 14 *infra*, a copy of Data General diagnostic software, presumably MV/ADEX, is placed in the temporary possession of each enrolled service customer. *See* J.A. at 3052, 3057. The customer, however, is not licensed to use this copy of MV/ADEX. And of course, the physical placement of MV/ADEX on computer-readable media in the possession of the customer does not effect a licensing of the software. "Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied. Transfer of ownership of any material object ... does not of itself convey any rights in the copyrighted work embodied in the object...." 17 U.S.C. § 202.

14. In its contracts with service customers, Data General merely "agrees to furnish ... maintenance service" on the customers' "equipment configuration." J.A. at 3052. Data General "install[s] and maintain[s] ... proprietary hardware, software and related documentation" at the customer's site for exclusive use by Data General employees in providing maintenance services. *Id.* It "endeavors to diagnose Equipment failures prior to providing on-site service but reserves the right, where appropriate, to provide on-site service as the sole service resource." *Id.* When performing remote diagnostic assistance, Data General "employ[s]" its "proprietary service technology and tools" in conjunction with "diagnostic media" as necessary to identify problems before dispatching field engineers. *Id.; see also id.* at 3057–58 (describing a "remote assistance proposal" as an addendum to the basic on-site service agreement).

15. Where evidence of conspiracy is "speculative or ambiguous," summary judgment is unlikely to encourage additional antitrust conspiracies, *Matsushita*, 475 U.S. at 574, 106 S.Ct. at 1348, and permitting trial on the basis of such evidence presents "considerable danger" that the fundamental requirement of an antitrust conspiracy "will be seriously eroded," *Monsanto*, 465 U.S. at 763, 104 S.Ct. at 1470.

*United States*, 345 U.S. 594, 605, 73 S.Ct. 872, 878–79, 97 L.Ed. 1277 (1953) ("[A]ny intrinsic superiority of the 'tied' product would convince freely choosing buyers to select it over others. . . .").[16] In sum, appellants have proffered neither "direct [n]or circumstantial evidence that reasonably tends to prove" that Data General and its customers "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 768, 104 S.Ct. at 1472–73, *quoted in Laurel*, 924 F.2d at 542. Absent evidence that Data General "exploit[ed]" its copyright in MV/ADEX to "force" customers into buying repair services "that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms," Data General may legally offer an attractive "package" that combines MV/ADEX with repair services using its copyrighted software. *Jefferson Parish*, 466 U.S. at 12, 104 S.Ct. at 1558; *see also United States Steel Corp. v. Fortner Enters., Inc.*, 429 U.S. 610, 622, 97 S.Ct. 861, 869, 51 L.Ed.2d 80 (1977). "Buyers often find package sales attractive; a seller's decision to offer such packages can merely be an attempt to compete effectively—conduct that is entirely consistent with the Sherman Act." *Jefferson Parish*, 466 U.S. at 12, 104 S.Ct. at 1558.

The "complete failure of proof concerning an essential element of [appellants'] case necessarily renders all other facts immaterial," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), and requires summary judgment against the nonmoving party. Accordingly, summary judgment in favor of Data General was warranted.

### III.

Appellants also argue before this court that the federal copyright laws do not prohibit their use of MV/ADEX for four separate reasons. First, they dispute the validity of Data General's copyright in MV/ADEX. Second, they assert that the 1976 settlement agreement between Data General and Montgomery bars Data General from asserting a copyright infringement claim based on appellants' use of MV/ADEX. Third, they argue that Data General is equitably estopped from enforcing its copyright in MV/ADEX. Finally, they contend that the doctrine of "copyright misuse" prevents Data General from enforcing any copyright interest it holds. We reject each of these arguments and affirm the district court's award of summary judgment on these issues also.

### A.

■ As an initial matter, Data General established an undisputed *prima facie* claim of copyright infringement. Data General's certificates of copyright registration for the different versions of MV/ADEX, J.A. at 2296–2317, are "prima facie evidence of the validity of the copyright and the facts stated in the certificate[s]." 17 U.S.C. § 410(c). For the reasons stated by the district court, *see* 737 F.Supp. at 342 & n. 10, we hold that appellants did not carry their burden of rebutting this statutory presumption of validity. *See* 17 U.S.C. § 410(c); *M. Kramer Mfg. Co. v. Andrews*, 783 F.2d 421, 434 (4th Cir.1986).

■ Appellants argue that MV/ADEX was not an original work or, alternatively, that Data General's failure to disclose the derivative nature of MV/ADEX to the Copyright Office invalidated the copyright. The presence of "approximately 1200 files on MV/ADEX as compared with 200 files on its immediate predecessor" was, as the district court found, "sufficient to establish that MV/ADEX is an original, not a derivative work." 737 F.Supp. at 342. There was also uncontroverted evidence that "existing files were substantially reworked in the development of MV/ADEX," evidence

---

**16.** Although appellants' evidence is insufficient to raise a question of material fact as to whether Data General has conditioned the *licensing* of MV/ADEX on the purchase of repair services, it may be sufficient evidence that Data General has conditioned *access to* MV/ADEX on the purchase of repair services. If access to MV/ADEX is considered the tying product, however, then appellants have failed to produce sufficient evidence of separate tying and tied products to withstand Data General's summary judgment motion. *See* note 9 *supra*.

that further underscores the originality of the software program. *Id.* Even if MV/ADEX had been a derivative work, appellants did not prove that any failure by Data General to advise the Copyright Office of the software's derivative nature was intentional. *See id.* at 342 n. 10. Appellants admit that they copied MV/ADEX extensively. *See* J.A. at 182, 543. They thereby violated Data General's exclusive right as copyright owner "to reproduce the copyrighted work in copies." 17 U.S.C. § 106(1).

### B.

■■■ As to their copyright defenses, appellants contend that the 1976 settlement agreement between Data General and Montgomery confers upon them the right to copy and use MV/ADEX for the servicing of Data General computers, or at least "bars [Data General's] copyright infringement claim." Appellants' Br. at 38. Paragraph 4 of the 1976 agreement provides in relevant part as follows:

Defendants [including appellant · Montgomery] agree, jointly and severally, that they will not, directly or indirectly, copy or utilize "Proprietary Information" of [Data General] for the design or manufacture of computers or for any other purpose except [i] maintenance or repair of [Data General] equipment, [ii] installation and integration of equipment manufactured or sold by companies other than [Data General], or [iii] other purposes permitted by any proprietary or confidentiality legends accompanying or made part of any data or documentation comprising Proprietary Information. "Proprietary Information" of [Data General] shall mean data and documentation which is marked confidential or proprietary to [Data General] by appropriate legend.

J.A. at 34. The district court held that the 1976 agreement did not impose "an affirmative obligation upon Data General to put into customers' hands the software and documentation necessary to enable STI to do repair, maintenance and integration work" or otherwise to extend to appellants

the right to copy or use MV/ADEX. 737 F.Supp. at 340. We agree with this conclusion for the reasons stated by the district court. *See id.* at 339–41. The language of the agreement neither imposed such an affirmative duty upon Data General nor granted appellants a right to receive a license to use software, documentation, or proprietary information created by Data General in the future. The district court correctly observed that "if Data General had been asked to provide all the proprietary information it might develop in the future, it would have refused." *Id.* It defies reason to conclude, as appellants would have us do, that Data General "traded away its future brainchildren" to the two former employees bound by the 1976 agreement for "relatively modest concessions." *Data Gen. Corp. v. Grumman Sys. Support Corp.,* 1989 Copyright L.Dec. (CCH) ¶ 26,399, at 22,515, 1988 U.S. Dist. LEXIS 16427, at *6, 1988 WL 159936, at *2 (D.Mass. Dec. 29, 1988) (interpreting 1976 agreement in related litigation involving Data General).

Circumstantial evidence of appellants' behavior after the signing of the 1976 agreement confirms that not even they interpreted the agreement as granting them the right to use MV/ADEX. For example, STI attempted to conceal its use of MV/ADEX and on one occasion attempted to obtain Data General software "by devious means." 737 F.Supp. at 341. Such behavior is not consistent with a belief that appellants were authorized to use Data General's proprietary information freely. "If STI believed that Data General was obligated under the agreement to provide STI ... with MV/ADEX, it would not have kept its use of MV/ADEX secret" but rather "would have advised potential customers" of its access to this valuable diagnostic software. *Id.*

### C.

■■■ Appellants' estoppel defense is also meritless. Equitable estoppel may deprive a plaintiff of an otherwise meritorious copyright infringement claim. *See Tempo Music, Inc. v. Myers,* 407 F.2d 503,

507 & n. 8 (4th Cir.1969). To avail themselves of an estoppel defense, however, appellants must show that Data General (1) misrepresented or concealed material facts, (2) intended or expected that appellants would act upon those misrepresentations or concealments, and (3) had actual or constructive knowledge of the true facts. *See, e.g., Coe v. Thermasol, Ltd.,* 785 F.2d 511, 515 (4th Cir.1986). Appellants contend that Data General should be estopped from defending its copyright because it "induce[d] [appellants] to use MV/ADEX in reliance upon Data General's prior practices, silence and inaction." Appellants' Br. at 58. Even if we credit evidence that Data General knew that other TPMs were using MV/ADEX, *see* J.A. at 3321–22, appellants failed to prove that Data General induced them to engage in the unlicensed use of MV/ADEX. Moreover, appellants failed to show, as they must to establish estoppel, that they reasonably and detrimentally relied on any misrepresentation by Data General. *Cf. Rothmans Tobacco Co. v. Liggett Group, Inc.,* 770 F.2d 1246, 1250 (4th Cir. 1985).

### D.

■ Appellants fare no better in their effort to establish a copyright misuse defense. In *Lasercomb Am., Inc. v. Reynolds,* 911 F.2d 970 (4th Cir.1990), decided after the district court issued its opinion, this court held that a copyright owner may not prevail in an infringement action if there is an "attempted use of a copyright to violate antitrust law" or if "the copyright is being used in a manner violative of the public policy embodied in the grant of a copyright." *Id.* at 978. The misuse of the copyright alleged by appellants is essentially that Data General tied its repair services to its copyrighted product. Our affirmance of summary judgment on appellants' tying claim in favor of Data General disposes of the copyright misuse defense. Furthermore, even though "a misuse need not be a violation of antitrust law in order to comprise an equitable defense to an infringement action," *id.,* appellants have offered no evidence that Data General did anything beyond limiting the use of the software to repair and maintenance of specific computer hardware, activity that is protected as an exclusive right of a copyright owner. *See* 17 U.S.C. § 106.

### IV.

■ Appellants contend finally that the district court abused its discretion in granting Data General's motion for a preliminary injunction and in failing to grant the appellants' cross-motion. In light of our resolution of the copyright issues raised in this case, we affirm the district court's decision to grant a preliminary injunction prohibiting appellants from further unauthorized use and copying of MV/ADEX. Once Data General established a *prima facie* claim of copyright infringement, the district court was entitled to presume that Data General could show both probable likelihood of success on the merits and irreparable harm. *See, e.g., Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.,* 843 F.2d 600, 611–12 (1st Cir.1988); *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.,* 780 F.2d 189, 192 (2d Cir.1985); *Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240, 1254 (3d Cir.1983), *cert. dismissed,* 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984). The district court determined that "the balance of hardships would seem to weigh in favor of Data General," 737 F.Supp. at 339 n. 7, a determination that we cannot conclude was clearly erroneous. Finally, appellants cannot demonstrate that permitting them to continue engaging the infringement of Data General's copyright would serve the public interest. Accordingly, we conclude that the district court had ample justification for granting Data General's motion for a preliminary in junction. *See Blackwelder Furniture Co. v. Seilig Mfg. Co.,* 550 F.2d 189, 193 (4th Cir.1977).[17]

---

17. It follows from our rejection of appellants' antitrust and copyright claims on the merits that the district court also properly denied appellants' request for a preliminary injunction. We therefore reject appellants' cross-motion.

CONCLUSION

For the reasons stated herein, the judgment of the district court is affirmed.

AFFIRMED.